### CONCRETE APPLIANCES CO. et al. v. GOMERY et al.

(Circuit Court of Appeals, Third Circuit. July 24, 1923.)

No. 2982.

**Patents ⬅328—948,719, for apparatus for elevating and distributing concrete and plastic material, held invalid for want of invention.**

The Callahan patent, No. 948,719, for an apparatus for elevating and distributing concrete or other plastic material, and comprising a tower, a horizontally movable boom, a conduit carried thereby, and means for raising the plastic material and conducting it to the conduit, *held* invalid for want of invention, in view of the state of the prior art and related arts.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

Suit by the Concrete Appliances Company and another against John E. Gomery and others. From a decree for defendants (284 Fed. 518), plaintiffs appeal. Remanded for modification, and, as modified, affirmed.

Arthur M. Hood, of Indianapolis, Ind., Stephen J. Cox, of New York City, and Cyrus N. Anderson, of Philadelphia, Pa., for appellants.

George B. Jones, and Thomas H. Sheridan, both of Chicago, Ill., and William Steell Jackson, of Philadelphia, Pa., for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. In principle, this case concerns the use of gravity in conveying mobile substances from an elevated common central point to various working points; in application, to the distribution of "wet" or "mush" concrete. Referring to the above general principle of conveying mobile matter by gravity, we have the age-worn practice of lifting water by power to a reservoir and by gravity distributing it through conduits to a fixed point or by hose to diverse points; in other words, the problem of lifting it to a gravity-sufficient height, of there accumulating it in storage, from thence conveying it

by conduit to a determined place, or by hose to an optional point of use. Naturally such general practice was early applied to the movement of such a mobile thing as grain, when its volume became large, and the word "elevator" became a synonym for the raising, storage, and distribution of grain, into individual cars, the ends of the same car, into ships, and, indeed, into separate hatches.

As an example of the common practice the proof is that prior to 1905, and since then, practically all elevators delivering grain to ships have been equipped with pipes, extending downwardly from the side of the elevator and supported by horizontally movable booms for directing the outlet of the pipes to any desired part of the boat, within range of the apparatus. But not only was such moveable conduit's discharge pipe handled by the boom on the elevator, but where the change of the tide or the lower level of the ship, caused by loading, made it desirable, a second or supplemental hopper and an additional spout were suspended from and handled by a boom and tackle on the ship itself. This supplemental hopper received the discharge from the elevator spout and discharged it into the vessel, as change of tide or the settling of the vessel necessitated. The proofs further show that, where two ships were lying side by side and it was desired to spout the grain to an outlying or "second-off" one, it was done by such elevator appliances in spite of the long stretch required. It was also a common practice to provide the spout with a telescopic extension end, by which further horizontal reach was effected, due to the varying positions of the ship. Moreover, it will be noted that on such apparatus the function of the boom was not only to raise, lower, and swing the spout to reach the hatches of the ship under different conditions of load and tide, but also to draw up and house the spout, so as not to interfere with the navigation or movement of the vessel.

The same general type of grain elevator appliance was used for loading cars. The proof is that:

"The hopper ends of the spouts were constructed with an enlargement, forming hoppers, and grain spouts were connected to them in the elevators. * * * All types of movable and fixed spouts were used in grain elevators at that time; of the movable type, those in the grain elevators were either portable or so constructed that they revolved around a fixed point. * * * Outside of the buildings they had spouts for shipping grain to cars, which were generally fixed in position with a telescope and either with one opening or two, so arranged that grain could be thrown into either end of the car."

Without further statement, it will be seen that the steps of lifting grain to get gravity, of storing to get quantity, of chuting to get delivery, and of boom swing and trough shift to vary locality of delivery, and also of duplication of these shore appliances by supplemental boom and conduit on shipboard, had all been advanced to a high state of efficiency and delivery point variation in elevator grain practice.

The same may be said of coal practice, the proofs showing the contemporaneous use of "coal chutes in connection with coal elevators in stock piles, where the coal was elevated and spouted out through the side of the building into a stock pile and into bins. The spout would be supported in a similar manner to the spouts heretofore referred to as shipping spouts in connection with grain elevators"; that is, "that

·the spout could swing in any direction and was suspended from a swinging boom."

Later, when concrete docks, piers, and the like came to be built, it was quite natural for contractors to use in building them the apparatus used for grain chuting, and to handle and chute concrete in the same way; and such, the proofs show, was the case, as will be seen by reference to but one or two operations. In November, 1906, a concrete foundation for an intake and pumping station was built by the Great Lakes Dredge & Dock Company at Gary, Ind. Here a car was used on which was a mixer, from which the concrete was discharged into a hopper or chamber, and from which chutes, suspended from a boom located on the car, chuted the mixed concrete down to the cofferdam, where it flowed either into piles or was poured in place; the dam being some 40 feet in width and of great length. The chutes in the apparatus could be moved up, down, and sideways. The apparatus was used for several months, and was constructed by a man who had never seen concrete so handled, but had seen it used in grain elevators. In addition to the testimony of the builder of this apparatus, another witness testified as follows:

"The first apparatus we used was a concrete mixer set on a flat car, and the concrete was spouted from the mixer into the bottom of the excavation. We called it chutes then. There was an improvement made on this apparatus to distribute the concrete from one location to another within a radius controlled by a boom holding the chutes or spouts. The ends of the spouts were—the location of the ends of the spouts were placed by swinging the boom that carried the concrete spouts."

The same man the next year used similar apparatus in building a concrete dock at the same place. In this case the apparatus was placed on a scow, a mast being placed in front of a mixer, a boom placed on such mast, and a chute suspended by tackle therefrom. As to its mode of operation, the constructor testified:

"It is dumped out of the mixer into a bucket, and conveyed up with a cable in a bucket, and dumped into a hopper, which is fastened on the tower; and we have one 50-foot section of 12-inch pipe carried by two booms and fastened on the bottom of the hopper, and as occasion requires, placing concrete in forms, we have 8-foot sections or 10-foot sections to take on or off.

"Q. How could you change the point of delivery of the lower end of the pipe? A. By adding on a section 10 feet long, or taking it off, as occasion required.

"Q. Was there any other way to change the point of delivery? · A. By swinging booms and swinging pipe.

"Q. Was this apparatus successful? A. Very successful."

Another witness described it thus:

"This apparatus is a concrete equipment built on a scow, consisting of a concrete mixer at the proper elevation, so that concrete could be spouted into the concrete dock, and above the mixer was constructed two hoppers, one for stone and one for sand; this being at one end, and the other end of the scow being the cement shed. A boom was placed to support the chute, for the purpose of raising the spout so that the concrete equipment could be moved—I meant to state for the purpose of spouting the concrete in the forms for the dock, and also to raise the spout when moving the equipment ahead."

He further testified that the number of chute sections used was determined by the distance from the mixer to the concrete forms, and that as much as five or six such sections were used on this work, and that the dock itself was 5,000 feet long.

There is proof of the use at San Francisco Harbor in 1904–1906 of substantially similar concrete chuting apparatus placed on a scow. It clearly shows the use of chutes moved to different positions by a boom. A witness, thus describing the boom's action, said:

"Well, the boom is the bottom end of it, and sets in a hinged socket, I would call it, and the outer end has a sheave in the end of it; the cable runs from the donkey engine to the sheave in the outer end, which is used to handle the pipe that carries the cement to the cylinders. All the use of this boom is to handle the pipe that carries the cement."

Moreover, a study of the proofs satisfies us that from the time concrete came into use there had been a struggle between the architects and designers, who, as a class, favored the use of dry concrete, which would not flow, and the contractors, who, for construction convenience, favored wet or mush concrete, which would flow, and therefore allow the use of distribution chutes, and that, as soon as the use of wet concrete became general, the art used the wet concrete chutes, which it could not use for the dry. In that regard, the proof was that:

"The more reinforced concrete came into use, the more contractors used wet concrete, and I should say that from 1908 on very much the greater portion of construction work was done in concrete than before; hence, also, the more wet concrete was used since that time."

In these evolutionary stages of the concrete art, the proof is that the builders of grain elevators took a leading part in the use and distribution of wet or mush concrete. In that regard, the proof is:

"Architects in general prior to the year 1904–05 demanded that concrete be mixed what is known as very dry, and to such a consistency that it required considerable tamping to make the water flow on top; but grain elevator designers and contractors have never been governed by architects' rules and guidance or specifications, as the elevator designer generally built the elevator that he designed, or that some other company designed; therefore they were a sort of law to themselves, and, in my opinion, were the first designing engineers and contractors to use what is known in the trade as 'wet' or 'sloppy' concrete. In my opinion this was brought about by the use of what is called 'slip' or 'movable' forms. By the use of such form, which is usually about 4 feet high, the wall, column, or girders, is formed by filling the movable form with sloppy concrete and reinforcing, and at the same time constantly raising the form by a series of jackscrews supported on steel bars, which are imbedded in the concrete. The jackscrews are fastened onto these bars, and by turning down the jackscrew the form is forced up, thus making the structure one monolithic mass; but to do this the concrete had to be run into the form in a liquid state, and such a liquid state that it did not require tamping, but only spading. * * * From the mixer the concrete was spouted into a hoist hopper. This hoist hopper was hoisted by power to the top of the building as it was in course of construction. When reaching the top, a gate, which was provided on the side of this first hopper, was opened, and the concrete material allowed to discharge through a spout into another similar hopper, but stationary. This last-named hopper was usually located about from 15 to 20 feet away from the side of the hoist tower, and in the elevator work was supported on the movable form. From this hopper the concrete was drawn into wheelbarrows or concrete carts, and with these distributed into the various walls, columns, and floors."

An engineering witness described the evolution and growing use of wet concrete in this way:

"About 1902 there was considerable agitation, among engineers of all kinds dealing with foundations, as to wet or dry concrete. The engineering fraternity was divided into two camps about that time, one advocating a concrete mixed quite dry and thoroughly tamped, and the other advocating using a concrete mixed quite wet, or mixed to a consistency which would enable it to flow easily, and which did not require tamping after being placed. This agitation, to my knowledge, extended over a period of about five years; the wet fellows arguing that from a constructional standpoint the concrete was easier and more cheaply placed and made a more dense mixture. About this time, also, 1902, I joined the Western Society of Engineers and attended the meetings quite frequently, and heard papers read by different engineers on both sides of the question. The use of reinforcing steel in concrete became more customary about 1902, and a former professor of civil engineering of the University of Illinois, Prof. Pence, read a paper before the Western Society of Engineers, describing tests he had made as to the expansion coefficient of concrete, with relation to the expansion coefficient of steels. * * * These experiments brought out the fact that it was possible to use steel and concrete together, so far as the expansion coefficient was concerned, and following this with the increased use of reinforcing steel in concrete it was almost imperative that a wet concrete be used in order to have it properly placed around reinforcing steel. Really, according to my opinion, the introduction of reinforcing steel made it imperative that concrete more of a consistency of a liquid be used, in order to build the structures then being designed, and this fact made it imperative that in handling this liquid concrete the chute or trough come into play."

Sensing the gradual increased use of the concrete art through these experimental years, it would seem from the proofs that the grain elevator contractors led the way in the broader use of mobile concrete, and that as the engineer determined the coefficient of relative expansion of steel and concrete was such as to permit their joint use in reinforced building construction generally, the consequent and indeed the insistent call for the use of wet or fluid concrete became more imperative, because such concrete could be better placed around reinforcing steel, and that this use of fluid concrete naturally brought with it the employment of fluid carrying troughs.

This insistent call for wet concrete was evidenced by the building requirements made by the city of San Francisco after the earthquake and fire catastrophe. In that regard an experienced engineer, who went there from the East to study building conditions, testified:

"There are so many different type of buildings in old San Francisco, but, roughly, the most decided change, I believe, was the general adoption of more concrete in the construction of the new buildings. As a rule concrete was substituted for former brick and tile construction wherever possible. Shortly after the earthquake two types of buildings were officially recognized by San Francisco, and generally through California; i. e., class A type, which consisted of a steel frame fireproofed by concrete, and class B building, which consisted almost entirely of reinforced concrete. This necessitated the more general use of wetter concrete than had been practiced heretofore, as walls and floors and fireproofing were of the minimum thickness allowed by safety, and could not be constructed with the older methods of dry concrete."

It is no reflection on the Patent Office of the United States, but simply an instance of how often the theoretical expert of an art is in his

office oblivious to the atmosphere of practical accomplishment in the field of achievement, when we note that, unconscious of this wide, growing, and much discussed use of wet cement, the Patent Office, on November 2, 1909, granted patent No. 939,072 to A. D. Ney, which was based on the specification statement by him made July 10, 1909, that:

"In the making of concrete, it has hitherto been the general practice in mixing the materials as stiff as possible, using only sufficient water to cause the adherence of the material together, and thereafter tamping the material to cause the mass to be as compact as possible in its relatively dry condition. In the operation of making the product of the present invention, a *radically different method is followed, in that an abundance of water is employed,* in order not only to permit gravity to bring the mass to a solid, compact condition, and thereby dispense with the ramming operation, but also to provide sufficient water for the purpose of crystallization. The process of forming the present process is essentially *a wet process,* and distinguished from the relatively *dry process employed* in making concrete."

In the actual state of the working art, which the proofs quoted above show in fact existed, and with the measure of the art, as evidenced by the Ney patent above quoted, then held by the Patent Office, Callahan and a number of other alleged inventors, who thereafter were thrown into interference with each other, applied for patents which had in view the spouting or chuting of wet concrete. Without attempting to settle the questions of priority between these claimants, we may say that the period which embraces their several dates is confined to a comparatively narrow compass, and to our mind they all serve to show that at or about the same time the natural mechanical evolution of the concrete art and the possibility of the use of wet concrete, mechanically, but instinctively, led all these men to adopt the same general types of mechanical appliances for the chuting of wet concrete. It is a situation to which we feel we may reapply what was said by this court in Elliott v. Youngstown, 181 Fed. 349, 104 C. C. A. 179:

"Nor is it necessary to dwell upon the suggestion that applications were made for blueprint machines with an automatic cut-off by four different inventors about the same time; Fullman and Herman among the rest. The fact that so many persons caught the idea goes rather to prove that it was simple and obvious, and not that it required inventive genius to conceive. It is not like the case where the art is waiting for the device, and inventors striving unsuccessfully to produce it, under which circumstances invention may well be held to appear."

Restricting ourselves, therefore, to the single one of these group inventors, we note that on January 21, 1909, Lee Callahan applied for, and on February 8, 1910, was granted, patent No. 948,719, here in suit, for a material transferring apparatus. As stated in the specification, Callahan's alleged invention had "for its general object to provide an apparatus calculated to be used to advantage in transferring concrete or other plastic material from a suitable source of supply to points desired on a building that is being built." It also stated a second general purpose was "to provide an apparatus of the kind stated adapted more especially for use when a building is to embody reinforced concrete." And likewise a third, viz. "for transferring other material from the ground to the points desired on a building in course of construction."

On his apparatus, Callahan was allowed the claims here in question, viz. 1, 2, 5, and 13, of which the first reads:

"An apparatus for the purpose described, comprising a tower, a suitably supported horizontally movable boom connected therewith, a conduit carried by the boom, means for raising plastic material to a suitable point in the height of the tower, and means for receiving plastic material from said raising means and conducting the same to said conduit."

This is fairly illustrative of the elements of the other three claims. The elements of the quoted claim are, first, "a tower;" second, "a suitably supported horizontally movable boom connected therewith;" third, "a conduit carried by the boom;" fourth, "means for raising plastic material to a suitable point in the height of the tower;" and, fifth, "means for receiving plastic material from said raising means and conducting the same to said conduit."

Comparison of Callahan's apparatus with the prior art shows that it really constituted no advance over that art, but, on the contrary, rather a step backward. For example, he either had no knowledge of the use of the open trough or chute, or, if he had, he made no mention of it or suggestion of its possible use, confining his specification and limiting his claims to "a conduit" or closed pipe. And the proof is that this closed conduit of his claims soon proved worthless on account of clogging, and had to be supplanted by the open chute of the earlier art. There was, of course, nothing new in his element of his elevating tower. That was as old as the elevator art. Making it extensible from story to story involved no more invention than if he had built his tower complete at the start, and allowed his building to build up to tower height, instead of the tower to the building height. His means to convey material up the tower was only another name for an elevator cage or container of suitable form and capacity. A receptacle for storage at the top was a common practice in grain and coal devices, and a boom to carry a chute or trough was common in the grain and concrete arts. In fact, we are unable to find any element of novelty, either in the separate elements Callahan used, or in the unification of such elements in the apparatus he suggested. Had the actual state of the prior art been shown to the patent authorities, we cannot feel they would have granted this patent, and while we feel embarrassed to find ourselves at variance with the Circuit Court of Appeals of the Sixth Circuit, which in the case of Concrete Appliances Co. et al. v. Meinken et al., 262 Fed. 958, found this patent valid, we feel assured that the meager record before that court wholly failed to disclose the now uncontradicted proofs on which we base our conclusions.

In the advance in the concrete building art, with the extension towers to great heights and chutes to great distances, the very magnitude and scale of the work are such as to impress the onlooker, and there is danger of one's being misled by their very magnitude into the belief that they must involve invention; but when their principle is sensed it will be found the known principles and practice, which marked the art long before this patent, have simply enlarged as construction enlarged its operation. That growth is in this case due to the appreciation of wet concrete, and convinced as we are that in roads, piers, docks,

bridges, and buildings generally concrete is the growing material of the future, we believe its advance should be in no way embarrassed by this patent, by which the art is now sought to be blanketed. The court below held the patent was not infringed. We go a step further, and hold Callahan, so far as the claims here involved are concerned, had no such patent claims to infringe.

The cause will therefore be remanded to the court below, to modify its decree by adjudging the claims in controversy invalid, and, as thus modified, the decree is affirmed.