**CARTRIDGE MACHINERY CORPORATION et al. v. NATIONAL COLLAPSIBLE TUBE CO. (two cases).**

(District Court, D. Rhode Island. July 27, 1926.)

Nos. 118, 187.

1. Patents ⬅328—Hooker, 922,585, for method of manufacturing cartridge shells, held not infringed.

The Hooker patent, No. 922,585, for method of manufacturing cartridge shells, is in the specific art of making cartridge shells out of hard material, and which will withstand the great pressure incident to the uses of military cartridges, and claims 3 and 4 held not infringed by a method of making collapsible tubes of soft metal as containers for tooth paste, shaving cream, etc.

2. Patents ⬅328—Hooker, 918,154, for method of manufacturing tubes, claims 2 and 6, held void for lack of invention, and claim 5 not infringed.

The Hooker patent, No. 918,154, for method of manufacturing tubes, claims 2 and 6, held void for lack of invention, and claim 5 held not infringed.

3. Patents ⬅328—Hooker, 1,352,194, for machine for making metallic tubes, held not infringed.

The Hooker patent, No. 1,352,194, for machine for making metallic tubes, claims 1, 3, and 4, if not invalidated for public use of essential features of the machine for more than two years, held not infringed.

In Equity. Suits by the Cartridge Machinery Corporation and others against the National Collapsible Tube Company. Decrees for defendant.

Perley H. Plant, of Providence, R. I., for plaintiffs.

Robert Cushman (of Roberts & Cushman), of Boston, Mass., for defendant.

BROWN, District Judge. The patents in suit relate to the production of metallic tubes in part by the extrusion of metals by pressure, the flow of the metal under pressure being regulated by confining walls which control the shape of the product.

The bill in equity No. 118 charges infringement of four patents. At the final hearing the plaintiffs withdrew patents to Lee, No. 822,285, June 5, 1906, and No. 824,-

875, July 3, 1906, leaving patents to Hooker, No. 918,154, April 13, 1909, claims 2, 5 and 6, and No. 922,585, May 25, 1905, claims 3 and 4.

Bill in equity in case No. 187 is for infringement of patent to Hooker, No. 1,352,-194, September 7, 1920, claims 1, 3 and 4.

[1] We may first consider the patent to Hooker, No. 922,585, for method of manufacturing cartridge shells."

Claim 3: "The method of making closed end tubes for use in the manufacture of cartridge shells, which consists in cutting a planchet from sheet stock, forming the same into a cup of smaller external diameter than said planchet, and elongating the same to form a tube by simultaneously applying pressure on the top of the wall thereof, and limiting the flow of the metal toward the center."

Claim 4: "The method of making closed end tubes for use in the manufacture of cartridge shells, which consists in cupping a blank by turning its edges upwardly, placing said cup in a' die, and extruding the metal thereof to form an elongated, closed-end tube by applying pressure to the top of the wall of said cup and causing the same to flow down and around a former having the diameter of the inside of the shell to be formed."

The specification refers at length to the patent to Lee, No. 822,285, which was withdrawn from suit at final hearing:

"In practice, I find that the method disclosed in certain patents, while suitable for some tubes where great strength is not required, is not adapted to the manufacture of tubes for modern military cartridges, as it does not produce shells of requisite strength to enable them to be reloaded a number of times and still withstand the very high pressure required."

A principal difference between the Lee patent and the Hooker patent is in the fact that Lee uses a plunger with a short cylindrical "former" projecting downwardly. This projection operates on a flat disk and performs the function of cupping it. The shoulder of the plunger performs the function of extruding the tube. It exerts pressure upon the rim of the cup that has been shaped by the "former." The plunger operates continuously in' the performance of these two functions.

Hooker, as the preliminary step, forms a metallic cup by drawing it up from a disk of larger diameter. A tube is extruded by downward pressure of the' plunger upon the wall of the cup. The Hooker patent, No. 922,585, lays stress upon the greater

strength of the cartridge when produced by his method. The specification considers at length the operation of the plunger upon the hard metal, and explains the effect of the Lee process in straining the metal, and the procuring of a uniform grain of the metal by Hooker's method.

The defendant disputes the validity of the Hooker patent, and has offered evidence of the unsoundness of his theory of the effect produced upon the grain of the metal. The defendant does not manufacture cartridge shells, and is not concerned 'with producing shells of strength requisite for modern military cartridges, to enable them to be reloaded a number of times and still withstand the very high pressure required.

The defendant does not manufacture . closed end tubes, but is in a distinct field of manufacture. It produces collapsible tubes, with an open end, to serve as containers for . tooth paste, shaving cream, and similar materials. It uses for the material block tin, a material wholly unadapted to "a method of manufacturing cartridge shells." Were the end of the defendant's tube closed like the plaintiffs', to resist pressure, the defendant's device would not function. The collapse of the tin tube under the slight pressure of the fingers suffices to extrude the soft contents of the tube through the opening in defendant's cup. While there is a superficial similarity between the Hooker method and the defendant's method, in that both produce a cupped blank from which the tube is to be extruded by downward pressure upon its wall, it is apparent that the defendant's blank or cup is designed to perform a different function in the completed product, as well as to permit the production of a collapsible tube by extrusion of a portion of the blank.

We have referred to the statement in the Hooker patent that the method disclosed in the Lee patent, "while suitable for some tubes where great strength is not required, is not adapted to the manufacture of tubes for modern military cartridges."

In the file wrapper it appears that, after rejection upon a reference to Lee, the patentee argued:

"The essence of this invention resides in extruding the metal of a cup, formed from a planchet of greater diameter by pressure applied to the top of the wall of said cup, whereby the metal is caused to flow in the' direction of its grain, and the machinery strains which arise when a circular blank is extruded are avoided."

It is apparent that the defendant, begin-

ning with an annulus of tin, instead of a flat disk of hard metal, was dealing with the problem of forming an open end suitably shaped to receive a screw thread and a removable cap, and also certain projections for the securing of that cap to the end of the tube. There is nothing in the case which shows that it had any problem relating to the extrusion of metals which was not fully solved in the Lee patent.

The defendant has introduced important testimony of Robert S. Williams, professor of metallurgy of the Massachusetts Institute of Technology, who produced photomicrographs showing the effects of pressure upon tin, and was of the opinion that the final product of the defendant's tube did not have anything added or subtracted from it in the way of strength by reason of any grain direction, or grain formation, that occurs at any stage of the process. Professor Williams, when asked, "Is there any problem in connection with the collapsible tube, the thin tube, analogous to that of the requirements for strength in the making of a cartridge containing an explosive?" replied, "I can see no connection."

This testimony is important upon the question of the validity of the Hooker patent, No. 922,585. I am of the opinion that it is not necessary, however, to consider this question in detail. It is evident that the claims are limited, both in terms and by the substance of the patentee's explanation of his invention in the specification, to problems that arise in the use of hard metals for the production of cartridge shells, problems with which the defendant does not have to deal. It is also evident that the claims cannot be so broadly construed as to cover the production of a structure of the special form of the defendant's open-ended tube. There is a substantial difference between the conception of a closed tube to form the solid end of a cartridge, and the conception of an open-ended cup to serve as the top of a collapsible tube. As the defendant does not desire a closed end, it begins with an annulus, and by omitting the central material of the disk avoids, to some extent, at least, the strains upon the material and the zones of weakness referred to in the specification of Hooker's patent. Moreover, the defendant's cup is formed partly by extruding the metal. The soft annular blank, after being pressed by the short "former" of the plunger, is extruded by the shoulder of the plunger to complete the shape desired for use as the top of the collapsible tube. The collapsible part of the tube is produced by the pressure of the shoulder of the plunger upon the circular rim of the cup.

The defendant's manufacture of a collapsible tin tube with a rigid top, having an opening through which soft contents may be pushed by the pressure of fingers upon soft and yielding tin made of a single piece of soft metal, and provided with a screw thread to engage a removable cap, is in substance outside of the scope of the Hooker patent, for "the method of manufacturing cartridge shells," and does not infringe the claims in suit.

To base a charge of infringement merely upon the fact that the defendant extrudes a tube by downward pressure on the wall of a cup is to ignore both the substance of the patent in suit and the explicit language of its claim. Upon this patent we cannot give credit to Hooker for a general invention in the art of extrusion of metals, which consists of extruding by downward pressure upon the wall of a cylindrical body. The patentee has not claimed such an invention. The Lee patent shows this process and other patents cited from the general art demonstrate that this feature in the general art of extrusion of metals was used by others before Hooker and Lee. The Hooker patent is not in the general art, but in the specific art of making cartridge shells out of hard material, so that they will withstand the great pressure incident to the uses of military cartridges.

If the patent should be sustained on the ground that Hooker was first to form a cup by a separate movement, this would deprive Lee of the right to use one die to form his cup and another to extrude it, though both ideas are embodied in his single punch for forming and extruding. To use two punches, instead of one, could hardly avoid infringement of the Lee patent.

[2] The patent to Hooker, No. 918,154, states that the invention relates to the manufacture of tubes by the method disclosed in the patent of G. W. Lee, June 5, 1906, No. 82,285. It shows manually operated means for extruding a tube, and additional means for trimming off the burr or flange remaining after the extrusion of the tube.

The claims in suit are 2, 5, and 6. I agree with the defendant that claim 2—the feature of which is bringing an extruding punch, one member, and a trimming punch, a second member, alternately into an alignment with the die—presents a familiar expedient of shifting the different tools to perform differ-

ent operations on the same blank. This is common shop practice, and the idea of applying to work held stationary in a die, first a forming stamp, and then a trimming stamp, does not present a patentable invention.

It is, of course, useful to gain speed by rapidly shifting the tools, and to follow a forming operation immediately by a trimming operation by a different tool, brought to the same position and then shifted out of operative position while the forming tool makes its necessary movement. The advantages resulting from this arrangement of parts are due to the ordinary skill of the mechanic, and a claim so broad as claim 2 does not bring in any specific feature of novelty in the arrangement, and is for an old mechanical combination.

Claim 5 includes as an element a bushing referred to in the specification as follows:

"This bushing constitutes one of the most essential features, which renders the present apparatus so efficient and practical. Heretofore, in carrying out the process of the said patent, the die was made integral, and it would not last when working on hard metal, such as copper, for example. In the present construction, the bushing has merely a driving fit in the die, and rests on the hardened plug 3, which takes the downward strain instead of the die, which is subjected to a radially outward strain only. It is essential that the bushing 6 should pass entirely through the die 4 and rest upon the hardened plug 3, as practice has demonstrated that, when the bushing is sustained by a shoulder within the die, breakage always occurs at that point."

There can be no doubt that claim 5 was drawn specifically to include this element, regarded as one of the most essential features. This being so, the claim is limited, and is not infringed by the defendant's device, which contains no bushing. In view of what the patentee has said, we should violate his clear intention by leaving this feature out of the claim.

Claim 6 states as an element: "A trimming punch, the diameter of which is intermediate that of said reduced portion and that of said former." The specification states:

"There remains to be described the construction and operation of the trimming punches. The action of these is to push the tube away from the flange left on the top of the bushing, and the only essential feature of their construction is that their diameter where they enter the dies must be intermediate the inside diameter of the bushing and the inside diameter of the tube. Thus they tear the walls of the tube away from the flange, and, as they go up again, the flange is carried with them, by reason of the contraction of the metal onto the punch and also of the dish-shaped form of the flanges, which, when the upward movement of the punch tends to straighten them out, causes them to bind on the punch."

By a stipulation in the case, the defendant's trimming punch is thus described:

"The trimming punch 14 is made with a cutting edge 14a, which has substantially the same diameter as the diameter of the bore of shoulder 8 of the die. The cutting edge 14a enters into the bore of the shoulder 8 with a close sliding fit, and in so doing shears off the burr or flange (see 13, Fig. 7, Sheet I) left at the top of the tube after the completion of the extrusion stroke of the extruding punch 13."

The plaintiff states that: "If the trimming punch enters the bore of defendant's shoulder 8, it must be of less diameter than the diameter of the reduced portion of the die; and if it shears off the flange it must be of greater diameter than the internal diameter of the tube." If what is termed a "close sliding fit" is what is meant by a diameter intermediate that of the bore of the shoulder, then it is difficult to distinguish the trimming punch of the patent in suit from trimming punches of the prior art. In other words, the combination is not characterized by a trimming punch of peculiar design. It would not constitute a patentable invention to combine a trimming punch of an old type with a forming punch, which formed a flange at the top of the tube. Whatever the mode of forming the part which it is desired should be trimmed away, the use of a trimming punch with a close sliding fit, suitable to shear off a surplus part, could hardly constitute a patentable invention. The timing of the alternate operation of these parts by familiar mechanical means is the work of the skilled mechanic rather than of an inventor.

I am unable to agree with the plaintiff that this patent in any proper sense relates to the metal extrusion art. The elements added to co-operate, after the metal has been extruded, to cut off surplus metal, are to perform old mechanical functions. The trimming punch still performs an old function in an old way. The use of a file to remove this flange would not constitute a new combination. The trimming punch is added to the mechanism, but the function it performs is separate from the art of metal extrusion, and is merely the trimming off of superfluous metal.

Patent No. 1,352,194, September 7, 1920.

[3] The claims in suit are 1, 3, and 4. Patentee states that his invention consists in certain improvements made in the machine, as well as the subject-matter, of prior patent No. 918,154. The dies and punches are the same. The improvements relate to the automatic feed of the blanks and the automatic shifting of the punches in time with the strokes of the press.

Plaintiff says that the feature of this patent is an assemblage of elements for automatically carrying out the process of patent No. 922,585. It is stated that the proper placing of the cup in the die prior to each descent of the extruding punch was a matter of difficulty. It is also stated that this patent claims broadly the picking up of the cup by the punch. It is claimed that this is a novel feature. Apparently the patentee feeds his cups from a rotating table against a fixed stop. The specification states:

"The blanks are fed, by any desired automatic feeding mechanism, successively into a pocket located at the same distance from the die toward the front as the distance of the trimming punch behind the extruding punch, and are picked up by the extruding punch on the same stroke of the plunger as that on which the trimming punch acts, while, on the next stroke, the trimming punch is idle and the extruding punch performs its operation in the die on the blank which it picked up on the previous stroke. The cup-shaped blanks are previously given a quasi polygonal internal shape, so that they will be picked up with certainty and be accurately centered on the extruding punch. * * *

"The blanks are fed to the point where they are picked up by the punch by a suitable feeding mechanism, comprising, as shown, a rotating dial plate 28, partially surrounded by a fixed wall 29 and lying beneath fixed guides 30 and 31, by which the blanks, which may be placed on the dial plate by hand, but are preferably automatically fed thereto by one of the well-known blank feed mechanisms, are guided into and along the guideways 32 until they arrive successively in the pockets 38, composed of the stop plates 33, mounted on the die holder 7, the end piece 34 of the guides 31, and the spring fingers 35."

A feature of claim 1 is a pocket into which the blanks are fed successively and from which they are lifted by the extruding punch.

Claim 3 has as an element a positioning stop for the blanks to be operated on. The punch alternately descends in line with the die and in line with a blank positioned by the stop.

Claim 4 is as follows:

"In a machine of the class described, the combination of a die plate, a die held thereon, and a blank-positioning stop fixed with relation to said die, a reciprocating plunger and a punch carried thereby, and means to move said punch on said plunger at right angles to its reciprocating movement, whereby the punch descends alternately in line with said die and with said blank-positioning stop."

The defendant claims that this patent is void for two years' public use. The plaintiff Metallic Shell & Tube Company, conducted by Hooker, carried on business in East Providence, R. I., from about 1910 to August, 1915, manufacturing radiator tubes for gasoline engines, railway torpedoes, and clinical thermometer cases. Its chief product was radiator tubes, made on extruding presses. These were Bliss presses, which Hooker equipped with a stationary extruding die; the tube carrier sliding horizontally on the vertical reciprocating head, and the extruding punch and trimming punch acting alternately on the work in the die.

The defendant relies principally upon the deposition of the patentee, Hooker, which is important from the fact that it was given after due consideration and a correction of his former testimony:

"XQ. 74. Have you mentioned to me during the intermission that you desire to make a correction in your testimony?

"A. I have. I want to correct the statement in which I said that, when we began to use the gravity slide, we fed the blank directly into the extruding die. The blank was placed in a sort of cage directly in front of the extruding die, picked up by the extruding punch, and carried by the next movement of the press into the extruding die.

"XQ. 75. To summarize the matter, according to your corrected testimony, does this correctly state the facts: That when you first began to use the feeding chute, before you left East Providence for Lowell, the incline chute fed the cup-shaped blank down to a kind of cage, which stopped the blank and turned it in position to be picked up by each alternate stroke of the punch?

"A. That's right.

"XQ. 76. And was that the same structure that you first used as soon as you got down to Lowell?

"A. It was.

"XQ. 77. Were all your presses used at East Providence equipped with that kind of a chute feed?

"A. I hardly think so; some of them were.

"XQ. 78. Were all the presses at first used in the United States Cartridge Company equipped with that kind of a chute feed?

"A. All that were used at that time.

"XQ. 79. How many such machines were used at first by the United States Cartridge Company?

"A. I could not say definitely, but several."

John F. Larson, who worked for Hooker at the East Providence factory, testifies to the manufacture of radio tubes by extrusion, and to the use in feeding the cup of an inclined chute and also a rotary table, and that the extruding die came over at the time the trimming punch was trimming off the last one, and would pick up the blank. On the next stroke it would go back, carrying the blank with it, and extrude it on the down stroke.

It is the contention of the plaintiff that it was not until the fall of 1916 that Hooker perfected his machine, so that it would operate satisfactorily to transfer the cup by means of the punch without any auxiliary mechanism. There is also evidence that, in order to enable the die to pick up the cup, a cup of special form was devised, with flattened surfaces, to more securely engage the punch; but the testimony of the patentee and of Larson is explicit that the blank was picked up by the extruding punch, and carried by the next movement of the press into the extruding die, in the machine used at East Providence.

The plaintiff relies upon evidence of changes in the machine which were developed after the closing of the East Providence plant, and after Hooker went to the plant of the United States Cartridge Company at Lowell, Mass., in August, 1915. After that time work was done by mechanics of that company in assisting Hooker to construct a practical working machine. Some doubt arises whether, for the manufacture of cartridges and other articles of hard material, the method of the patent is practical without a cup of particular form to engage the plunger and make a good adherence.

The defendant also cites prior patents, which show the feeding of blanks to a position to be picked up by the punch and carried by the punch to the die.

I am of the opinion that the patentee's own testimony and that of his assistant show that, more than two years before the application for the patent in suit, the broad conception of having the extruding punch pick up the blank and carry it to the die was embodied in the East Providence machines, and used in the manufacture of metallic tubes.

It is stated by the plaintiff that Mr. Hooker, in his testimony, failed to explain that other mechanism in addition to the punch was used to pick up the cups; but, even if auxiliary means were used in connection with the punch, the statement is clear that the conception of the punch picking up and transferring the blank was not a novel conception at the time of the application for the patent in suit.

It is apparent that many of the difficulties which arose in the development at Lowell of improvements upon Hooker's machines were difficulties arising in the course of a specific manufacture of cartridge shells out of hard and unyielding material. Apparently, with soft material, such as the defendant uses, the method of picking up the cups, which the patentee admits was used at East Providence in connection with copper tubes, was practical, without additional mechanism to pick up the cups, and without special configuration of the cups to make them adhere.

A general difficulty in the case arises from the attempt to cover within the art of extrusion of metals all of the mechanisms described; whereas, the patents relate, not to any substantial novelty in the art of extrusion of metals, but rather to the performance of familiar mechanical operations by machinery.

The increase of rapidity with which a product can be turned out, by concentrating the different operations and by speeding up machinery, is common in all branches of art.

In improving upon the Lee patents, Hooker encountered the problems of trimming the flange, of feeding blanks to the die, and of timing the alternate action of the operative parts. These were problems in the general art of machine construction, and his combination of familiar devices for performing these functions is subject to anticipation in that general art, rather than in the different and narrower art of extrusion of metals. Concrete Appliances Co. v. Gomery, 269 U. S. 177, 46 S. Ct. 42, 70 L. Ed. ——.

The case involves other topics, which have been presented with thoroughness and ability by counsel for both parties, but which do not seem to require specific discussion, since, upon a consideration of the whole case, I am of the opinion that whatever the defendant may have derived from the teachings of the patents to Lee, which have been withdrawn from

the suit, it has embodied in its machine no novel mechanical device or combination, and no knowledge of the art of extruding metals which originated with Hooker.

The bill will be dismissed.

A draft decree may be presented accordingly.