**ZENITHERM CO., Inc., v. ART MARBLE CO. OF AMERICA et al.**

**No. 6305.**

Circuit Court of Appeals, Fifth Circuit.

Feb. 18, 1932.

Fred J. Bechert and George H. Mitchell, both of New York City, and F. Lewis Peyton, of Jackson, Miss., for appellant.

William H. Watkins, of Jackson, Miss., and Roland C. Rehm, of Chicago, Ill., for appellees.

Before BRYAN, SIBLEY, and WALKER, Circuit Judges.

SIBLEY, Circuit Judge.

Zenitherm Company owns United States patent No. 1,183,694 granted to B. Sutter on May 16, 1916, and claims that the product X-ite made by Art Marble Company infringes claims 1 and 4 of it. From an adverse decree the Zenitherm Company appeals. We think claims 1 and 4 taken at their face are too broad and merely embrace the prior art; if limited to the present process and product of the Zenitherm Company there is insufficient disclosure, and also no infringement by X-ite as manufactured by Art Marble Company.

Prior to 1919 a rough, bulky material with granulated cork as its basis, used for insulation but coated with something else for a finish, was manufactured under the patent. It had no great success. In 1919, cork having become hard to obtain, experiments were made with wood shavings which the following year resulted in the present product called Zenitherm. To make it, a sugar barrel full of shavings is mixed dry with 120 pounds of magnesite, a small quantity of asbestos or kieselguhr, and coloring matter added, and then wet with about 30 gallons of a solution of magnesium chloride of strength 20° Baumé with 2½ per cent. of zinc sulphate. The mixture is put into molds and pressed under a cover plate in a hydraulic press with a line pressure of 2,500 to 3,000 pounds per square inch. The pressure is maintained overnight, when the slab is taken from the mold and dressed with a wood planer, sawed with a circular saw into desired sizes which resemble planks and may be sawed and nailed like them and used for floors, walls, or other building purposes; are light, tough, heat-resistant, nonhygroscopic, and sound-deadening. The product has attained a considerable commercial success. During 1921 and 1922 one Welch worked at the factory of Zenitherm Company, and after leaving began to make a similar product called X-ite, getting a patent of his own. He organized the Art Marble Company. X-ite, as that company makes it, calls for 55 gallons or one barrel of shavings, 60 pounds of magnesite, 8 pounds of clay, 5 of asbestos, with coloring matter, and about 20 gallons of magnesium chloride solution. It will be noted that there is about half the magnesite but more than half the quantity of chloride solution than is used in Zenitherm, with the same amount of shavings. The magnesite, clay, asbestos, and chloride solution are first mixed together, making a more fluid mass than the Zenitherm ingredients would, and afterwards the shavings are mixed in and the mixture placed in molds. At one time a press was tried but immediately abandoned. Pressure obtained by clamps was used and abandoned. Now not even a top plate is used on the mold, but with the hands or a stick the mixture is pressed into the corners of the molds and patted down. The molds are set aside overnight. The slabs are then planed and sawed up as is Zenitherm, and have very much the same qualities and appearance, except they are not so dense and hard and not so suitable for flooring, but by reason of porosity are claimed to be better in side walls for insulation against heat and for deadening noise. A similar product, but made under hydraulic pressure, was attacked as an infringement of the Sutter patent in Craft-Stone v. Zenitherm Co. (C. C. A.) 22 F. (2d) 401, 403. Claims 1 and 4 were held valid and infringed. Insufficiency of disclosure and overbroadness of the claims were not considered in that case, and the prior art has here been more fully presented. We do not feel bound to follow that case, but will examine the patent anew.

■■ The patent is not a basic one, but only claims new and useful improvements in fireproof insulating materials, and the process of producing them. Claims 1, 2, and 3 relate to the process as a new and useful art, and claims 4 to 9, inclusive, relate to the product as a new and useful composition of matter, both patentable under 35 USCA § 31. As a requisite to validity and as the consideration for the monopoly asked, the applicant for a patent must disclose the nature of the product and the manner and process of making and compounding it in such full, clear, and exact terms as will enable any person skilled in the art to which it appertains to make and compound the same, and must particularly point out and distinctly claim the part, improvement, or combination which he claims as his inventon or discovery. 35 US CA § 33. A failure thus to disclose and particularly to claim the invention renders the patent, though granted, void. Permutit Co. v. Graver Corporation, 284 U. S. 52, 52 S. Ct. 53, 76 L. Ed. ——. On the question of novelty not only may direct anticipation and known practice in the particular art be looked to, but also the knowledge and practice in related arts, for it requires no invention to adapt such from one to another of such arts. Carbice Corporation v. American Patent Development Corp., 283 U. S. 420, 51 S. Ct. 496, 75 L. Ed. 1153; Powers-Kennedy Contracting Corporation v. Concrete Mixing & Conveying Co., 282 U. S. 175, 51 S. Ct. 95, 75 L. Ed. 278; Concrete Appliances Co. v. Gomery, 269 U. S. 177, 46 S. Ct. 42, 70 L. Ed. 222. The art of making artificial wood and artificial stone, and even of making and molding brick and concrete are such allied arts. Seventy prior patents have been cited against the Sutter patent as anticipations and as showing the prior art in artificial wood and stone and hybrids thereof. These show and Sutter's specification admits that wood shavings, cork, clay, asbestos, fibers, binders, and pressure were all in precedent use. The vegetable matter put into the mixture is for cheapness, lightness, and insulation. The clay and asbestos and magnesite are for fireproofing effects. The binder and pressure are for strength and solidity. Sutter's specifications claim that some of the materials are hygroscopic, inflammable, and liable to disintegrate, and that when natural wood resins are the binder used, the pressure and heat necessary to make the resins bind cause a bad result in that the wood is injured and the product inflammable. He states that his object is to avoid these troubles, and that his invention consists in making a fireproof insulating building material of an insulating value equal to that theretofore in use, but having greater strength so as not to need supporting walls, being also sound-deadening and nonwarping, worked like wood and capable of taking finishes, of being cast and molded, and of being dyed or colored, and all without charring or burning or losing the natural resins. The preferred method of doing this is stated to be to take granulated cork, cover completely each particle of it with powdered magnesite and then add as a binder a solution of acetyl cellulose, putting the mixture into a mold, and subjecting it to "sufficient pressure to form one homogeneous mass, the amount of pressure varying with the raw materials used, but not enough to destroy the minute air cells in the finished product." No proportions of ingredients are stated and no specifications of pressure given save as above. Stratified and reinforced blocks are then suggested, and to these the drawings of the patent relate. To these also the claims of the patent are directed, except claim 1 for the general process and claim 4 for the general product. The expression "homogeneous" throughout the patent evidently means solidified. His stratified blocks would never become homogeneous in the true sense by pressure, nor would any other heterogeneous mass. Homogeneity must depend on the original nature of the mixture. The materials so far described are not used by Art Marble Company, but the specification next states that Sutter does not confine himself to them but may use other suitable waste materials, such as granulated corncobs, peat, seaweed, sawdust, wood flour, granulated wood, or other fibrous material; asbestos or other fireproofing clays of commerce; and as a binder any fireproof cement or liquids now commercially known most suitable to the raw materials used. On the broad sweep of the last statement are based claims 1 for the process and 4 for the product.

■ Claim 1 reads: "The process of making a fireproof insulating material of great structural strength which consists in mixing granulated vegetable matter in its natural state with granulated mineral matter until each particle of vegetable matter is coated with mineral matter, mixing the product with a binder in fluid condition and compressing the material into a homogeneous mass." No virtue is claimed for the order of mixing, which is not, indeed, followed in producing X-ite. No novelty exists in any material and none is claimed, nor in the proportions of them, for none are given. The vegetable matter gives lightness, cheapness, and insulation from

sound and heat, which properties were all well known before this patent. The mineral ingredients are for fireproofing qualities also well known. Pressure is to obtain form and solidity, the usual aim and function of pressure, and familiar to the prior art. The prior art is illustrated with special reference to pressure, the element most relied on here as involving patentability, by some of the earliest patents. Thus Sorel, who invented the binder used both in Zenitherm and X-ite and known as Sorel cement, obtained in 1870 United States patent No. 100,945. By its teaching inert materials, either mineral, animal, or vegetable, with coloring matter, may be mixed with Sorel cement, wet either to form a mortar or only dampened like molding sand; "the plastic substance thus formed being then poured, pressed, or rammed into molds or rolled or spread into sheets, slabs or other form required, soon setting and forming hard, strong and durable stone or other product partaking of the color and qualities of the substances combined." In 1875 King obtained United States patent No. 174,260, teaching the mixture of wood shavings or chips with some suitable glue or cement poured or sprinkled over them and mixed so as to be "properly coated on all sides," after which the mixture is placed "under heavy pressure until all the pieces of shavings and chips have adhered together and a solid block is formed." In 1880 Pope was granted patent No. 226,-547, he reducing his wood to an impalpable powder, mixing it with a suitable binder and afterwards "pressing it to a solid consistency, the degree of solidity depending on the pressure applied." In 1907 Siegman obtained United States patent No. 866,691 for artificial wood, using Sorel cement added to waste vegetable matter and wet until "damp but not plastic; sufficiently damp to cause the adherence of the parts when compressed hydraulically or otherwise." Grote in 1894 obtained United States patent No. 521,264 for a mixture of wood and magnesite to make a building material, claiming as a merit that "no pressure is required to consolidate it," indicating as well known the use of pressure. He obtained a similar patent in Germany, and the German patent to Wehner, No. 10,196, also claims as a merit the elimination of the press. In England, Wade obtained patent No. 156 in 1887, under which shreds or fragments of wood are amalgamated with other substances and cemented together under pressure, securing uniformity of texture and an easy method of reducing them to any shape desired. In 1891 Robertson obtained British patent No. 17,050, under which vegetable

fibers have added to them "a suitable quantity of cement to coat the fibers," wood chips, sawdust, and the like being well mixed therewith and "placed in molds and subjected to pressure by which means the water is expelled and a compact, spongy body obtained" useful as a lumber or stone substitute. German patent 13,774 was granted to Thielman in 1889, for Hornite, to make which disintegrated waste wood is mixed with a pasty binder, "the plastic material thus prepared may be used in the manufacture of various articles by pouring same into a mold and is then consolidated by means of any suitable press, the pressure being continued until the mass is solidified." The materials, their mixture, and pressure being thus old, no proportion of ingredients nor degree of pressure is disclosed by Sutter or particularly claimed by him as producing any new or surprising result. If he discovered any such, he kept silent about it. The increase of any of them to increase their usual effect is not invention. Finley v. MacDougald Const. Co. (C. C. A.) 28 F.(2d) 674. The opinion in Craft-Stone v. Zenitherm Co., supra, states: "The gist and principle of the invention lie in lightly coating the chips with mineral matter and then compressing them into a homogeneous mass," and elsewhere the pressure is referred to as heavy pressure. Economy in reducing the more costly binder and strength and hardness obtained by pressure are urged in argument as the merit of the invention. There is of course economy in lightly coating the chips if the chips cost less than the coating, and more pressure can be used and more is necessary for consolidation when less binder is used, whether it be resin, glue, or cement, but neither of these facts is so much as mentioned in the patent, much less particularly claimed. The patent applies to all depths of coating and to all pressures that the experimenter—he would be nothing else—may use. The whole argument for the validity of this claim comes from confusing the claim with the present product Zenitherm. It seems to be a meritorious and perhaps a novel product deserving of a patent, but its proportions and the secret of its manufacture are not to be found in this patent. It is claimed that Welch, the infringer, learned them by working in the Zenitherm plant. The patent, had it made proper disclosure, would have told him all there was to know. It is true that claim 1 covers the process used in making Zenitherm as it does X-ite, and as it would any like thing that any one might make of granular vegetable and mineral matter mixed with a liquid binder in any proportions and compressed to hardness by any nec--

essary amount of pressure. Plainly the claim, if taken at its face, is too broad. If confined to the process of making Zenitherm, supposing that there is patentable novelty in it, there was no disclosure of the proportions or pressure to be·observed to get the new results from the old elements. And finally, if· the claim be so limited as to mean a light coating and a heavy pressure, as seems to have been done in the Craft-Stone Case, X-ite would not infringe because there is an uneconomical excess of binder, and the pressure of tamping the mixture into molds is so inconsiderable as to be undeserving of the name of pressure, and is so ancient and universal a practice in the plastic art as not to contribute patentable novelty to any process.

The case of Seabury v. Am Ende, 152 U. S. 561, 14 S. Ct. 683, 38 L. Ed. 553, is readily distinguished. There the prior art knew that boracic acid covering a wound would prevent infection, and covering animal matter would prevent decay, and that glycerine would keep the boracic acid in a damp and active state. The invention consisted in the discovery that the acid and glycerine might be put upon cotton wadding and the flesh to be preserved covered by or wrapped in the wadding with the same result. The invention was fully disclosed and claimed, it being unnecessary to describe the compounding of boracic acid and glycerine, which was already well known. So in Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523, a wire screen used to convey and drain the fluid paper-stock would pull and disarrange it by its motion. The invention was that by increasing the slant of the screen the fluid paper-stock would by gravity run down it and that the speed of the wire might then be accelerated to equal that of the paperstock, overcoming the previous drag of the wire and increasing the output of paper. This invention was fully disclosed and claimed, but since paper-stocks would differ in fluidity, no exact slant for the screen could be specified in advance and greater definiteness was held unnecessary to the validity of the patent, since in each machine the speed of the screen could readily be accelerated to equal the flow of the paper-stock in use. In the case of Sutter, of course it was unnecessary to disclose things already well known, but he is in ·the dilemma either of there being nothing new to disclose, and hence no novelty, or else of having failed to disclose that which was new, with a consequent invalidity of his patent.

█ The fourth claim for the product reads: "As a new product a composition of matter consisting of finely ground or granulated vegetable matter retaining all its natural resins, each particle coated with a fireproof clay and some suitable binder, the coated particles being in close contact with each other in a homogeneous mass of great structural strength, fireproof and possessing high insulating, non-hygroscopic and sound-deadening.properties substantially as described." This claim has all the weaknesses of claim 1, and is even broader, for it is not restricted to liquid binders and makes no direct mention of pressure, the element most urged as patentable. The words "its particles being in close contact with each other in one homogeneous mass" is the closest approach. This description would fairly apply to any reasonably solid artificial wood or stone. The record abundantly shows that if wood flour or other "finely ground vegetable matter" as named in this claim be covered with a liquid binder the result is a putty, which is not compressible and will not be altered by pressure. This claim directly covers many of the products of the prior art and is thus anticipated by them. American Fruit Growers, Inc., v. Brogdex Co., 283 U. S. 1, 51 S. Ct. 328, 75 L. Ed. 801. We therefore hold claims 1 and 4 to be void for want of disclosure and for too great breadth—too much claim in the claims and too little specification in the specifications. If by any means they can be sustained by importing an element of high pressure as included in them, they are not infringed by X-ite.

Judgment affirmed.