## C. B. COTTRELL & SONS CO. v. CLAYBOURN PROCESS CORPORATION.

(District Court, E. D. Wisconsin. October 14, 1926.)

1. Patents ⬅️328—1,054,130, for machine for shaving printing plates, held invalid for anticipation.

McKee patent, No. 1,054,130, February 25, 1913, for a machine for shaving printing plates, having a plurality of independent spring-pressed fingers arranged to exert pressure, in proximity to shaving knife, held invalid for anticipation.

2. Patents ⬅️45—Model of machine covered by prior patent held competent as original evidence of patentee's accomplishment outside of his paper disclosure on issue of novelty of patent in suit.

In suit involving validity of patent for machine for shaving printing plates, model of machine covered by a much earlier patent and accompanying plates held competent on issue of novelty as original evidence of what prior patentee accomplished outside of his paper patent disclosure.

3. Patents ⬅️66(2)—That prior patent made no impression on the art involved held not to detract from its quality as an anticipatory work.

That earlier patent, relied on to sustain defense of anticipation in infringement suit, never made any impression upon the art, held not to detract from its quality as an anticipatory work.

4. Patents ⬅️37—Use of known machine or device to carry out step in patentably novel process does not make machine patentably novel.

Resort to a known machine or device for carrying out either an old or a new step in a patentably novel process does not make the machine or device patentably novel in the sense of patent law.

5. Patents ⬅️328—1,077,621, for method of treating printing plates to give uniformity of thickness, held invalid.

Patent No. 1,077,621, for method of treating printing plates, so that its printing back and face will be brought into substantial parallelism, held invalid for anticipation.

In Equity. Patent infringement suit by the C. B. Cottrell & Sons Company against the Claybourn Process Corporation. Complaint dismissed.

E. Clarkson Seward, of New York City, and Edwin B. H. Tower, Jr., of Milwaukee, Wis., for plaintiff.

Lines, Spooner & Quarles, of Milwaukee, Wis., for defendant.

GEIGER, District Judge. [1] The case arises on two patents granted McKee, assignor of plaintiff. The issues of validity and infringement necessitate some detailed examination of the patents declared upon, prior patents to the same patentee, and also other earlier patents urged as prior art. The patents in suit, viewed in the light of other McKee patents, arouse serious misgivings respecting their real merit, because of the possibility of equivocally asserting them as embodying "process" or "method," or "machine," inventions.

It may result in a better understanding if, before analyzing the two patents in suit, the work of McKee, as found in his prior patents, be first adverted to. The structures or processes deal broadly with type-printing plates. In the consideration of this case, no distinction between so-called stereotype and electrotype plates will be recognized. It may be that in later days processes and machines are concerned more particularly with the latter; but, if so, it is because such plates have come into commoner use. If, in any aspect, processes or machines dealing with the one are distinguishable from those dealing with the other, and if, therefore, identities of the two "arts" should be debated, not the slightest question could be raised respecting the closest possible analogy.

Upon the record, McKee's earliest endeavors are found in his patent No. 760,235, granted May 17, 1904. He there said:

"Stereotype and electrotype plates of type matter, as well as those containing pictorial illustrations, in the condition in which they are ordinarily delivered by the manufacturer to the printer, are generally, or very often, more or less defective, in that their faces are so uneven that the printed impressions which they produce have some parts unnecessarily dark or heavy, while other parts are objectionably light or pale. These defects are known in the trade as 'sinks' or 'shrinks.' In such defective plates, the parts which produce the darker or heavier impression are commonly thicker than the parts which produce the lighter or paler impression; the backs of the plates being even or plain, or nearly so, and the sinks or shrinks being only or chiefly on the face."

This invention, whose object is to cure "these defects," is thus described:

"There is first obtained, by laying together one upon another two or more sheets or layers of paper, or like fabric, a matrix the face of which corresponds exactly or approximately with the face of the plate to be treated, its higher or less sunken portions corresponding with the higher or more prominent portions of the face of the plate, and its lower or more sunken portion corresponding with the lower or less prominent portions of the face of the plate. The matrix thus obtained

and the plate to be treated are then placed face to face, with the more prominent parts of the two opposite each other, and the less prominent parts of the two opposite each other, and while they are so placed together are laid on the bed of a shaving machine, with the matrix in register with the face of the plate, the back of the plate being upward, and, while they are so laid, the back of the plate is subject to a shaving operation in which, by the *plowing nature or pressure of the shaving knife,* when removing the shaving or material from the back of the plate, every part of the face of the plate, through the yielding nature of the metal, is brought into close contact with the face of the matrix, so that the face of the plate becomes for the time the counterpart of the face of the matrix, and those portions of the back of the plate opposite the higher portions of the matrix are brought to greater prominence than the other parts, and consequently more metal is cut away and removed by the act of the shaving operation than at such parts on the back of the plate, where the plate sprung down into the lowest or low parts of the matrix. The shave may consist of a single cut, or of two or more light successive cuts. After the shaving operation, and its being relieved from the *shaving pressure,* the plate by its own resiliency springs back so far toward its original condition that its face resumes its original form, containing its original sinks or shrinks, while its back so nearly corresponds with its face that the thickness of the plate, measured to the face of the type matter, is uniform in all its parts. The plate, thus reduced to uniform thickness, is then placed without the matrix between two perfectly smooth parallel surfaces, such as those of the bed and follower of a heating box or press, which are heated to a suitable degree of temperature to so soften its metal as to render it sufficiently flexible, and is there subjected to such pressure as to render it perfectly even both on its face and back, in which condition it will remove after cooling, when it is ready for printing." (Italics supplied.)

In this patent McKee professed the applicability or adaptability of his invention to both flat and curved plates, and received the recognition disclosed in, among others, these two claims:

"Claim 1. In a process of treating uneven printing plates for evening their faces, the improvement which consists in subjecting the plate to a shaving operation while its face is in contact with a matrix having in its face more and less prominent parts corresponding with the more and less prominent parts of the face of the plate."

"Claim 4. In a process of treating uneven printing plates for evening their faces, the improvement which consists in placing the plate with its face in contact with the matrix in which are more or less prominent parts corresponding with the more and less prominent parts of the face of the plate, and while in such contact subjecting the back of the plate to the action of a shaving knife which at the same time forces the face of the plate to form the counterpart of the matrix and also shaves the back of the plate."

This patent was issued May 17, 1904, upon an application filed March 16, 1904. On June 18, 1907, patent No. 857,531, was issued to McKee upon an application filed December 21, 1901, more than two years prior to the application and issuance of the patent first above noted. In this patent, after referring to the practice "technically known as 'making ready,' and which consists in 'underlaying' the plate and 'overlaying' on the impression cylinder, so as to compensate for the irregularities of the plate and obtain therefrom impressions of the exact character required," he asserts as the main object of his then invention "to dispense entirely with the work of making ready or of underlaying and overlaying, and to make the necessary corrections (or cure the defects) in the plates themselves, and so that after treatment of the plates they may be placed on the press and the printing directly proceeded with. He professes to deal, not only with the curing of defects, but with the treatment of plates, so that desired heavy or light impressions of portions thereof may be predetermined, instead of resorting to underlaying and overlaying. His steps include first the taking of a proof from the plate as it arrives from the typer, for the purpose of determining defects to be corrected, and also the particular portions of the plate to be made to print respectively light and heavy. These are indicated in pencil mark on the proof sheet and then—

"The pressmen will cut out from the proof sheet such portions of the impression as are to be printed heavier, and add to the proof sheet pieces of paper at those portions of the impression which are to be lighter, the strength of the impression being graduated or reduced to the minimum or vanishing point, if desired, by adding several thicknesses of paper where needed; the rule to be observed being to build up highest where the impressions are to be lightest, and to depress or cut away from the proof or face sheet

where the impressions are to be heaviest, the intermediate portions to have varying thicknesses, or to be built up at different levels between the two extremes, where the portions are to be printed with graduated strength of impression. This proof sheet thus cut out constitutes what I designate as a 'matrix,' and is used subsequently for the purpose of producing in the face of the plate a series of depressions and elevations the reverse of those produced in the matrix, and so that, when impressions are taken from the plate, the high or elevated portions of the face will yield the darkest impressions, and the lower or depressed portions of the plate the lighter impressions."

He further proceeds in the description of his invention:

"Having prepared the matrix, so as to predetermine just what changes shall be made in the face of the plate, the matrix is thus preferably laid face up on the flat cold bed of an ordinary shaving machine, and the plate placed thereupon face down, so that the high and low portions of the matrix shall register with those portions of the face of the plate that are to be made respectively low and elevated. The plate and matrix being then properly held in position on the bed, the shaving knife is actuated, so as to take a plurality of cuts from the back of the plate. In making these cuts the knife will cause the plate to yield or to be deflected in accordance with the steps, depressions, or cutouts in the matrix, and in such a manner as will be hereinafter more fully described, so that at the completion of the shaving operation there will be produced in the back of the plate the series of depressions and elevations, the opposite of those previously formed or produced in the matrix, while at the same time, owing to the resiliency of the plate, the face of the plate will be or remain straight and even, or substantially so."

The patentee succeeded in the allowance of 82 claims on his "process" and his "product," and the comprehensiveness and scope claimed by him is further manifest in his statement that—

"In so far as certain features of my improvements in the art of printing or manipulating the plate are concerned, it will be understood that I do not wish to be limited to each and all of the steps of the complete process to which I prefer to subject the plate, for some such steps may be used without others, or in connection with still other steps or mode of treatment, to produce certain of the results produced by me, and to avoid either in whole or in part the work of 'underlaying' and 'overlaying.' I desire to cover herewith, not only the process as an entirety, but also the essential steps or subprocesses thereof."

The first 14 claims characterize his invention as an "improvement in the art of treating manufactured relief printing plates"; the improvement being stated, e. g., in claim 1:

"In mechanically producing in the printing face of such plate depressions and elevations at predetermined places, where the printing is to be respectively light and heavy, and also in the evening or leveling the back of the plate."

The next 13 claims introduce the preparation and use of the matrix described in the specifications. The next 20 claims characterize the improvement as one in the "art of preparing printing plates." These 20, either expressly or by implication, introduce the matrix. For example, claim 17:

"That improvement in the art of preparing printing plates which consists in preparing a matrix with high and low portions, corresponding respectively to the depressions and elevations which are to appear in the face of the printing plate, then placing the matrix and printing plate face to face, then subjecting the same to pressure and to the action of a shaving knife, and producing thereby in the back of the plate depressions and elevations the reverse of those in the matrix."

Some 35 claims are devoted to disclosures of nearly every possible variant statement of the object of his invention, or the results produced upon practice of his so-called process. For example, claim 47:

"That improvement in the art of preparing printing plates having 'make ready' formed therein which consists in applying a matrix to the plate and subjecting the plate and matrix to heat and pressure."

Again, claim 63:

"That improvement in the art of preparing curved printing plates having 'make ready' formed therein which consists in curving the plate under heat and pressure with an applied matrix."

Some 18 or 20 claims profess to cover what is characterized as "a new article of manufacture," a "printing surface," a "printing block," or a "printing plate." For example, claim 64:

" * * * A relief printing plate, whose face constitutes the printing surface and is formed with depressions and elevations at

those portions where the impressions are to be respectively light and dark, and whose back is even and level."

Again, claim 70:

"A printing plate reduced in thickness from the back and depressed from the front to correspond to a successive gradation of light and shade represented by the picture on the face."

Again, claim 72:

"As a new article of manufacture, a relief printing plate having a permanently formed graduated printing surface."

Claim 78:

"As a new article of manufacture, a printing plate having the required 'make ready' permanently produced in the face of the plate."

The extended reference to these two patents prompts the observation that McKee thus far aimed to disclose processes, or steps in processes, and at no point made claim of novelty to or in a machine, structure, or device. We assume that he did not claim to be the inventor, or first discoverer, of a matrix. In any event, his two inventions dealt, not with the discovery of a matrix, but with the introduction of a matrix as a step in processes for treating stereotype or electrotype plates. The present case presents no issue which necessitates debate respecting the novel character of his processes in their embodiment of one or more types of what are called matrices. But the two patents most strikingly disclose, either expressly, by assumption, or by implication, the presence in the art of highly accurate and adequate leveling or shaving machines. If either or both of the patents is or are valid, as embodying "processes," it follows that every sort of a mechanical structure or device capable of or aiding in the practice of the processes or the taking of any steps would be excluded.

The processes, it must be assumed, could not be practiced by any one in any way, and therefore, by way of anticipating some of the matters hereinafter discussed, it is assumed that the Davison (later considered) or any other shaving or leveling machine could not be used in practicing the invention disclosed in claim 1 of McKee's patent No. 760,235 of 1904, viz. the process for treating uneven printing plates, or evening their faces, "in subjecting the plate to a shaving operation while its face is in contact with the matrix," etc. (see claim 1, supra); nor claim 17 of the second patent, supra, viz.:

"In preparing a matrix with high and low portions, corresponding, respectively, to the depressions and elevations which are to appear in the face of the printing plate, then placing the matrix and printing plates face to face, then subjecting the same to pressure and to the action of a shaving knife," etc.; nor in practicing the processes of claim 47, supra, viz. "preparing printing plates, having 'make ready' therein, which consists in applying a matrix to the plate and subjecting the plate and matrix to heat and pressure."

No matter for what object Davison's machine was intended, its use in any of the so-called processes disclosed in these two patents would be forbidden.

This brings us to a third patent issued to McKee, viz. No. 988,583, dated April 4, 1911, upon an application filed July 2, 1909. That professes to be an invention of "a new and useful treatment of printing plates." Reference is made to the art of obtaining greater relief in the blacker printing parts of the plate, by storing a greater quantity of metal on the back of the plates, etc., as a result "obtained by the process of preparing printing plates as described in United States letters patent No. 857,531, June 18, 1907." See patent last above. The specification then described the preparation of a matrix, "so as to predetermine just what changes shall be made in the printing face of the plate to produce the desired result. And he describes his third and new discovery thus: "This present invention is directed to the process of treating printing plates, consisting in subjecting the back of a plate to local pressure along the same in close proximity to the shaving knife, as it is being subjected to its shaving operation; the said local pressure serving to assist the knife in crowding or forcing the metal away from the edge of the knife at the unsupported portions of the plate, for leaving a greater thickness or storage of metal at such unsupported portions."

The specifications of his patent—that is, "means for carrying out" his alleged process —are said to be represented in drawings "in which figure *I* represents a printing plate shaving machine suitable for carrying out *one step*" of the process. Such specifications then give in detail varying plans and sections of the machine, the matrix, etc. And he described the portion of the machine for accomplishing his processes which consist in "subjecting the back of the plate to local pressure" as above indicated, thus: The means shown for exerting pressure on the plate locally along the same in close proximity to the knife is constructed, arranged, and operated as follows: A plurality of spring-pressed fingers are mounted upon

a cross-shaft, carried by brackets forming a part of the knife-carrying member. Each of these fingers comprises a downwardly and inwardly extended arm and an upwardly extended arm. One of these arms is provided with a barreled roller to roll along the back of the printing plate in close proximity to the shaving knife. The patentee defines his expression, "exerting pressure locally on the back of the plate," as "contemplating the independent application of pressure at different points on the back of the plate." His first claim reads:

"In the process of treating printing plates, applying a matrix to the face of the plate, said matrix having high and low portions corresponding respectively to the depressions and elevations which are to appear in the face of the printing plate, subjecting the back of the plate to an action of a shaving knife, and exerting pressure locally on the back of the plate in close proximity to the shaving knife, for assisting the knife in forcing the unsupported parts of the plate away from its edge during the shaving action."

Other claims introduce the "exertion of pressure locally" "by a plurality of independent pressure devices." It would seem that, notwithstanding detail description of a machine which is to exert "local pressure," the whole machine being "suitable for carrying out *one step*" of the process, the patent and all of the claims profess to deal strictly with a process. So far as the claims are concerned, the means for mechanically carrying out the step of exerting pressure are not even claimed to be new. The asserted novel step in the process is the exertion of local pressure, thereby to further effectuate the processes described in the earlier patent, 857,531.

This brings us to a consideration of the first patent in suit, No. 1,054,130, issued February 25, 1913, upon an application filed June 26, 1909. It may be noted that the application for this patent was filed approximately one week before the patent last above considered, No. 988,583, and the specifications of the two patents are open to interesting comparison.

In patent 988,583, the invention is declared to be "a new and useful treatment of printing plates, of which the following is a specification": In the first patent in suit, now being considered, the invention is declared to be "a new and useful printing-plate shaving machine, of which the following is a specification." In each of the patents is found the statement, hereinbefore copied, respecting the processes referred to in patent No. 857,531, July 18, 1907, above considered, and each summarizes the matrix process. Thereupon the patentee proceeds to characterize the object of the inventions thus:

In patent 988,583:

"The present invention is directed to the process of treating printing plates, consisting in subjecting the back of a plate to local pressure along the same in close proximity to the shaving knife as it is being subjected to its shaving operation, the said local pressure serving to assist the knife in crowding or forcing the metal away from the edge of the knife at the unsupported portions of the plate for leaving a greater thickness or storage at such unsupported portions.

In patent 1,054,130:

"The present invention is directed to the shaving machine and has for its object to provide means such as a plurality of independent spring-pressed fingers arranged to exert pressure locally upon the back of the plate in close proximity to the shaving knife, the said fingers serving to assist the knife in crowding or forcing the metal away from the edge of the knife at the unsupported portion of the plate for leaving a greater thickness or storage of metal at such unsupported portions."

In patent 988,583 the patentee says:

"Means for carrying out my process are represented in the accompanying drawings. * * *"

In patent 1,054,130:

"A practical embodiment of my invention is represented in the accompanying drawings."

In each patent the specifications proceed in identical language to describe the mechanical parts for shaving under the pressure of a plurality of spring-pressed fingers a plate in conjunction with a matrix:

Thus, again, under patent 988,583, the patentee says, in describing the manner of carrying out his process, "after the formation of the matrix":

"The plurality of independent spring-pressed fingers located adjacent to the knife will exert their pressure in the back of the plate as it passes beneath the knife, thus serving to exert pressure locally along the plate and assist the knife in crowding the unsupported parts of the plate away from the edge of the knife for permitting portions of the plate opposite the raised portions of the matrix to be removed in one or more shavings by the knife."

Under patent 1,054,130, after describing the machine:

"The plurality of independent spring-pressed fingers which exert their pressure on the back of the plate as it passes beneath the shaving knife, serve to exert pressure locally along the plate, thus assisting the knife in crowding the unsupported parts of the plate away from the edge of the knife for permitting portions of the plate opposite the raised portions of the matrix to be removed in a series of shaving operations by the knife. The shaving operation is continued until a further shaving is made covering the entire area of the back of the plate, or until the plate has been shaved to the thickness desired."

Upon this application claims were allowed, among them:

"(1) In a machine of the character described, a shaving knife and means arranged to exert pressure locally upon the plate being shaved, along the same, in close proximity to the knife."

"(3) In a machine of the character described, a shaving knife and a plurality of independent spring-pressed fingers arranged in close proximity to one another each arranged to exert pressure locally upon the plate being shaved, in close proximity to the knife."

It will be observed that even this patent assumes the prior high development of shaving machines, wherein there appeared to be a necessity—which was met—of pressure on the plate while it was being shaved, and this patent professes nothing more than an improvement for exerting pressure locally along the plate:

"Thus assisting the knife in crowding the unsupported part of the plate away from the knife for permitting portions of the plate opposite *the raised portion of the matrix* to be removed in a series of shaving operations by the knife." (Italics supplied.)

Plainly, all this professes to further the object and the carrying out of the process claimed in patent No. 857,531, viz. the predetermination, and carrying into a plate over a matrix, of high and low portions, for the purpose of effecting light and dark printing.

This brings us to the second patent in suit, No. 1,077,621, granted November 4, 1913, upon an application filed March 24, 1911. This patent described the identical machine of the patent last above considered. But, after the observation that, in the preparation of printing plates, after the plate has been cast, "its printing face and its back will be more or less distorted and the plate will be liable to be thicker at one portion than at another," McKee declares that the object of his present invention is "to treat the plate so that its printing face and its back will be brought into substantial parallelism, thus avoiding the necessity of using an underlay during the printing portion, the treatment of the plate also being carried out *without* the *use* of the matrix." (Italics supplied.)

He proceeds: "This invention is particularly directed to the process of treating printing plates consisting in subjecting the back of the plate to local pressure along the same in close proximity to a shaving knife as the plate is being subjected to its shaving operation, the plate being placed face down upon the bed of the shaving machine *without an interposed matrix,* the said local pressure serving to assist the shaving knife in crowding or forcing the metal away from the edge of the knife at the unsupported portions of the plate—i. e., the parts not resting on the bed—so that when the shaving operation is completed the plate will be of substantially the same thickness throughout."

The specifications describe the identical machine of the prior patent. His first claim is:

"In the process of treating printing plates, to bring their printing faces and backs into substantial parallelism, placing the plate on a flat surface, subjecting the back of the plate to the action of a shaving knife and to the independent application of pressure at different points, along the same in close proximity to the shaving knife, for assisting the knife in forcing the unsupported parts of the plate away from its edge during the shaving operation."

Further claims add as a step in the process: "Finally subjecting the plate to heat and pressure for leveling the face of the plate."

We therefore find that a patentee, claiming to work in the art of "treating printing plates," professes in three process patents and one machine patent to be dealing with a novel step or a novel mechanism for carrying out the novel step, to wit, a matrix. A final patent claims the discovery of a process, novel in that it subjects an ordinary printing plate without matrix to the same operation of the same machine, and it results in parallelism of back and face. I think counsel for the defendant has given an accurate summary, viz.:

"We have here a situation where the same machine is disclosed in three separate and distinct patents; in the first patent, No. 988,583, the operation of the machine is claimed in terms of a process to produce the printing plate having an uneven surface, a product which was already old in McKee, 857,531. In the second patent, No. 1,054,130, which has been called the first patent in suit, we have the same machine claimed as a machine using the disclosure of the first patent No. 988,583, as a basis; and in the third patent No. 1,077,621, the second patent in suit, we have the same machine now claimed in terms of process. If, as it now appears, the same machine can be used to cover the process of the earlier patent, No. 988,583, and the later patent No. 1,077,621, wherein the difference of operation of a machine consists in the type of service upon which the plate rests, how can the intermediate patent for the machine itself cover the use of this machine as described in the later patent No 1,077,621."

This "situation" is presented in an art wherein, as indicated, shaving or leveling

machines had apparently developed what might be called a conventional type, whose characteristics—with the exception of his alleged novel introduction of a local pressure device—seems to have been recognized and assumed by McKee. That type seems also to have embodied, inherently, adequate pressure devices, capable, according to McKee's earliest patent, of dealing with shrinks and sinks, even where a matrix was used, but, so his later patent indicates, not quite adequate for situations where the matrix is introduced for the purpose of carrying out the processes of his patents, which have the object of treating plates so as to produce predetermined high and low portions. And his device, or his step, at best, in practicing the matrix process, is merely to "assist" the pressing and cutting operation of the knife. At the threshold of the whole case is the Davison patent, No. 3,836, granted November 26, 1844, and at that early date that inventor disclosed practically all of the fundamentals of a conventional type of plate-shaving machine. But the embodiment therein of a separate pressure mechanism bears most pertinently upon the present case. Davison calls his invention a "machine for leveling or planing the backs of the plates," and he describes it in detail. The drawings—also the model, which was lodged with the Patent Office at that time—disclose precisely the machine described in his specifications. After pointing out such parts as the foundation, the bed plate, and its operating mechanism, the feeding screw, the method of securing the plate and a filler, the cutting cylinders, he proceeds:

"Just behind the cylinder-cutter is firmly affixed a stationary knife (W) made very stout and strong, so as not to be sprung by the pressure of cutting; its edge is brought near to the cutters on the cylinder and acts on the plate directly after the cylinder-cutter has reduced it somewhat level; taking off a shaving and leveling the plate, so as to complete the whole at one operation. By the ordinary mode of operation in leveling plates, if they are cast thick, they have to be passed several times through the machine, and, if very thick, the cost of reducing them would be greater than casting over; but by the apparatus thus described the thickest plate can be reduced at one operation. While at the same time it is leveled by the stationary knife, and is of great importance and cannot be effected by the lathe that has been heretofore used for the purpose of turning off plates or by the revolving cutter alone. The plate as it passes under the cutters, re-quires to have pressure on it, directly before them to keep it down steady. To effect this a shaft (t) is placed across the machine in front of the cylinder-cutter, on standard projection up from the foundation plate, from which the shaft fingers or springs (ttt) extend out, curving down and backward to the plate on which they rest, just in front of the point where the cylinder-cutter is acting. They are held down with any degree of force required by means of crank (o), which may be held by a catch on the plate (m) when in operation; these springs act with much greater certainty than rollers as they will each follow any irregularities in the thickness of the plate at the point where they are resting."

He obtained a claim as follows:

"(4) I claim the combination of the revolving and stationary cutters for reducing and leveling the back of stereotyped plates as herein made known, and in combination therewith the springs or fingers for holding down the plates."

So we have the significant disclosure of a combination whose element, "the springs or fingers for holding down the plates," appears to have been added in a construction already provided with means for holding the plate, already equipped to exert the pressure both of revolving and stationary cutters, but which is added because the plate requires to have pressure on it directly before (in front of) the cutters to keep it down steady. For this purpose quite accurate terminology—i. e., "spring fingers" projected from a cross-bar—is used. And it ought to be assumed that the term "finger" is used to describe a mechanical device or element which will discharge the function of controlling or directing motion—in this case obviously pressure upon the plate in proximity to the cutting. That such element was not intended to subserve an unsubstantial step or movement is clear:

(1) From a construction adequate to receive a large range of applied force.

(2) Because the device, inherently, in a mechanical sense, receives, distributes, divides up, and localizes the applied force; that is, through its plurality of spring fingers.

(3) In connection with the latter, the inventor's definite choice of the described device as against "rollers."

With respect to the last-noted choice, there may be debate whether the choice was made against the alternative of a single roller extending transversely across the plate (see some of the later planing machine pat-

ents), or as against a plurality of rollers quite common in the later art, and found in the structures in suit, though still denominated "fingers." But this must be true, if Davison's conception clearly embodied the device inherently capable of, if not clearly intended for, distribution and localization of pressure, if he sought, or if he found, this device as a novel advance over a single roller bar, which was bound to exert pressure in a fixed plane, then, so far as this case is concerned, his disclosure was and is fundamental, and, regardless of exact limits of equivalency, was and is, as against any later disclosure, in this same limited field, entitled to have a "broad and generous signification." National Hollow, etc., Co. v. Interchangeable Co. (C. C. A.) 106 F. 710.

If, on the other hand, he had in mind variant constructions for localizing pressure, whether they be called "fingers," "pressure fingers," "pressure rollers," or "divided rollers," as they appear in subsequent structures in the general planing art, he is all the more entitled to be recognized as the original inventor of the device for discharging the limited function desired. And it is of no small pertinency, in thus considering Davison, that McKee's earliest patents, dealing with processes, seem to have assumed that shaving machines, as he referred to them in his specifications, and as it must be assumed he thought they were well known in the art, were adequate to shave, even over matrices, without the later conceived necessity for "assisting" or "localizing" pressure.

In any event, Davison made a choice between "these springs" and "rollers," because the former "act with much greater certainty." His suggestion that they will *each* "follow any irregularity in the thickness of the plate, at the point where they are resting," conclusively indicates his conception for *localization* of pressure. The choice between spring fingers and rollers would be idle, if neither discharged any function save that of merely traveling with the plate. And, of course, if Davison had in mind the interposition of this "spring-finger" device for any purpose, and if it in fact discharged the function of exerting pressure locally, then it does not matter that he may not have appreciated the higher degree of necessity for having such pressure in the later development of electrotype plates; nor does it matter that he may not have made the better choice—that is to say, that spring-pressed fingers, consisting of divided "barrelled" rollers, may prove to be preferable. The important fact is that he was the pioneer con-

ceiver and constructor of the mechanical element which is now insistent to have been novel with McKee.

Before leaving the consideration of Davison's patent, it is proper to advert to matters in the record, which are believed most persuasively to support the view which is above expressed as appearing on the face of his patent. That evidentiary support is found in the record:

First, in Davison's model; second, in the plates partly and wholly shaved, *apparently* a part of his model disclosure; third, printed law books, disclosing pages *apparently* produced by or from the model plates; fourth, the Davison machine, built by the defendant and operated before the court.

[2] Criticism is made by the plaintiff respecting competency and pertinency of some of these proofs. I am assuming that the model and accompanying plates, which are produced either originally or by photographic or photostatic duplicates, if standing alone, might be of doubtful competency as original evidence of what Davison may have accomplished outside of his paper patent disclosure. When, however, this model and these plates appear to have been received by the government as a part of and in connection with an application for a grant, and remain in the government's possession for upwards of 80 years; when likewise, *apparently*, the government is able to produce in this litigation such model, partly and wholly finished plates as a part of what was deposited when the patent was applied for, and when it appears (at least inferentially) that in law books published in about 1845 by Davison, who was a printer, stereotyper, and an official publisher of the state of New York, these plates were then used in producing the printed publications; when there is no suggestion other than the good-faith existence of these strong circumstances so concurring in point of time with Davison's written application, and concurring in substantive respects with the published drawings and descriptions found in the patent application—the court ought not conjecturally to indulge in the possibility of fabrication, in order to reach a conclusion that, after the lapse of 80 years, such offered proofs have not even the circumstantial probative value which would unhesitatingly be accorded out of court. And I therefore feel justified in freely according to this showing competency as original, even though circumstantial, evidence.

The significance and probative value of some of these circumstances is at once seen

when the plates thus produced are conceded to be surprisingly accurate—in fact, perfect—within recognized tolerance of two to three thousandths of an inch; the same is true on considering the machine built by the defendant upon the specifications and disclosure of Davison's patent and model. It was brought before the court, operated, and, of course, even to a layman, did not appear to be an "exact reproduction" of Davison's model. It is to be expected that, after 85 years of development in methods of building machinery, in methods of furnishing power, any attempt at reproduction of the Davison machine, as he discloses it in his model, would be varied in "nonessentials." But the machine seems to me not to have been impeached as a quite faithful reproduction in its essentials. What is meant is that, if Davison's patent were to-day alive, the machine produced here in court could by no possibility escape a charge of infringement. The particular element here in question, namely, the pressure device, seems to have been faithfully reproduced, and the machine as a whole, when operated, produced surprisingly accurate results—plates concededly perfect.

This showing impels the conclusion that Davison in his original disclosure, not only comprehended and worked out a basic planing or shaving device, but also the very thing which is at issue in these cases, and that the springs or fingers therein embody equivalently the very construction for producing local pressure in the shaving of plates which is found in both the plaintiff's and defendant's machines.

[3] This conclusion seems to me not disparaged in the slightest degree by considerations—if they be true—urged by the plaintiff thus:

"The Davison patent has never made any impression upon the art. Defendant failed to produce any evidence to show the contrary, and negative evidence submitted by the plaintiff, going back nearly 50 years, shows that men in this art, in different parts of the country, never heard of nor saw any such machine. Testimony of Cottrell, Barber, Schuler, and Richards. And Claybourn makes corresponding admission." Plaintiff's brief herein.

Witnesses, in 1926, might truthfully testify that they "never heard of nor saw any such (Davison's) machine." That, however, falls far short of denying the reality, or detracting from the quality or dignity of Davison's work in 1844. Nor can such ignorance of latter day workers in the art (and it would seem that the ignorance of the Patent Office

may be added) dignify the work of McKee, nor support the sweeping statement that "the Davison patent has never made any impression on the art." Indeed, Davison, on the record before us, stands out as the pioneer discloser of all that McKee *assumes* in his patents with respect to shaving machines adequate to practice his processes—except his alleged "assisting" device in bringing pressure upon the plates. And it cannot be held that the "art," as the plaintiff seems to use that term, should be regarded as excluding, not only Davison, but also the other patents produced by the defendant, to which may be added Wesel, 609,643, and, in view of the file wrapper of McKee's patent, No. 1,054,130, the patents therein cited, Ranger, also Oncken and others, veneer-cutting machines. In other words, while the defendant may not have shown the progress of the art from 1844 as disclosing distinct steps involving recognition of Davison, the plaintiff, on the other hand, is confronted with the fact of Davison's disclosure and the recognition of that fact (though not under the name of Davison) in the general type of machine that has been particularly devoted to planing or leveling printing plates; and the plaintiff is likewise confronted, as about to be noted, with the alternative of finding McKee's exact disclosure of his specific pressure device in the general planing art at least 40 years prior to the issue of his patent.

In my judgment, the case may be considered upon the record before us in entire disregard of the Davison patent, and McKee's claimed invention could not stand against other complete anticipatory structures. Preliminary to this, and, as just intimated, the view is taken that the court is not strictly confined to any so-called "stereotype or electrotype plate *treating* art," but in truth we are called upon to deal with mechanisms which are mere *planing* machines. The processes of stereotyping and electrotyping—the modes of making plates—may at some stage and in some senses be totally diverse, in no sense analogous. That is to say, the art of molding and stereotyping as a process may be said to be quite unrelated to electrotyping or electro processes. But when plates have been finished, and are to be subjected to ordinary mechanical processes, such as shaving, planing, or leveling, any so-called "treatment" in that respect opens for consideration the known "art," "processes" and "machines," available to accomplish such purposes. And it may not even necessitate consideration of so-called "analogous"

arts. It may present simply the question as to what was broadly known as a process, as a method, or as a machine or device, for accomplishing those desired results *in any art.* The clock and watch making art or industry would nearly seem to be analogous to the bedspring industry, and yet, when a process or method for restoring and retempering was embodied in an application for a patent limited to bed or furniture springs, the "art" was conceived to be, not the bedspring or furniture art, but rather the art—practiced in watch and clock making and repairing (and otherwise known)—for restoring mechanically strained wire or steel pieces and strips. Lovell Mfg. Co. v. Cary, 147 U. S. 623, 13 S. Ct. 472, 37 L. Ed. 307.

When, therefore, we seek to test McKee's work *not* as something *other* than *treating* by shaving, leveling, or planing, but as necessitating consideration of structures or processes old and well known in the planing or leveling of wood or metal products, we find quite conclusive support for defendant's position, wholly independent of Davison. The fact, apparent upon inspection of many of the devices called to the attention of the court, that they are clearly derivative from (some appear to be copies) earlier disclosures in the same general art, alone justifies this course, and dispenses with the necessity of any refined tests of "analogy." And, recurring to suggested differences which the plaintiff urges exist between stereotyped and electrotyped plates, the fact remains that that distinction has not been noted, even if we respect the type plate art as standing alone. Nowhere is it assigned as a ground for differentiating the structures therein from the general planing art.

Little more is required to substantiate this view than a reference to patents like Lane, No. 317,379, May 5, 1885, and Holmes & Beugler, 509,435 November 28, 1893, the former of which discloses a plurality of pressure rollers on a "traveling bed planing machine of the class adapted to plane several narrow boards of uneven thickness at one time." That patent is of particular interest because apparently that feature of the attachment was not entirely novel even in 1885, but novelty was claimed in a further element in combination therewith, viz. the attachment of sectional "bonnets." And so Holmes & Beugler of 1893, supra, seems to assume that divided rollers for pressure purposes are old and subject to slight improvement, directed to keeping certain parts in place when adjusted and secured at any desired point. A glance at the drawings, spec-

ifications, and claims of either of those two patents leaves no doubt of their surprising identity with the divided rollers and the varied means of exerting pressure and of their adjustment, found in the patents in suit.

Of course, this means identity of mechanical principle, of mode of operation, and of results, and it makes little difference whether any of these be characterized by the more common terms of "shaving," "planing," "leveling," or, as hereinafter noted, "parallelism." In determining the question presented on these various patents, nothing is gained by referring to steps or machine processes as "treatment," because no distinction ever has existed, or can or does exist, between the "treatment" of pine boards or of stereotyped plates, when subjected to the ordinary machine processes of planing.

It thus appears that McKee, in his earliest patent, had for his object the *evening* of faces of stereotyped or electrotyped plates, the "defects" being "sinks" or "shrinks," and his remedy is found in the use of a matrix. An ordinary shaving machine—he assumes that the art knows it—is adequate to perfect the practice of the process, save only the subsequent application of heat and pressure to the plate. Whether or not the practice of this process achieved the objective of removing sinks and shrinks is of no importance in this case; but his assumption that, with the use of an ordinary shaving machine, a leveling of the plate is accomplished, is important. His second patent, however, disclosing an objective, namely, the retention of such existent, and the production of further, depressions, elevations, or reliefs as may be desired—all to the purpose of effecting shading in printing—is obviously in a different field of endeavor. However, here again his novel step is in the development and use of matrices; and as he says, and as his claims indicate, his new processes superseded "make ready," "underlay," and the like. Again, the process is submitted for practice upon what he assumes the art will readily understand, to wit, a shaving machine. Obviously, during the life of that patent (1907–1924), if the "process" be accorded validity as patentably novel, it could have been practiced by no one without leave to McKee; that is, no one could shave a plate over a matrix, no matter what machine he used. The "process," if valid, forbade. But no one was thereby forbidden to proceed without a matrix, and upon any machine open to the public, according to the known art, to shave a plate, to level or otherwise to treat it. In other words, prior to patent 857,531, it was

open to use machines like Davison, Wesel, Lane, or any of the conventional type of shaving machines, upon stereotype and electrotype plates.

When, therefore, McKee, in his third patent, No. 988,583, for the first time addressed himself to mechanical means claimed to be novel, for the purpose of carrying out the processes of patent No. 857,531, he could in no event claim that, by first committing his mechanism to the carrying out of a process which of itself professed to build upon the art of shaving *without a matrix*, he at the same time committed the mechanism to monopolizing the old art. He did not profess to have invented a means, having the dual patentable novelty of shaving *with* or *without* a matrix. He expressly asserted novelty of means to effectuate or to practice novelty of means as *one step* in his previous novel matrix process. That process, as noted, had a distinct objective or desideratum; that is, the retention, the production or creation, of elevations or depressions desired for light or heavy printing. It would seem to follow, therefore, that if patent No. 988,583 is valid, either as a process or as covering a device, the novelty of the latter as a means for practicing one step of the matrix process, the monopoly is invaded only when infringement of the process, actual or threatened, is shown; that is to say, McKee certainly acquired no right to forbid the manufacture or sale of the Davison machine (assuming that the Davison machine might be used to practice the McKee process), unless and until it appeared that the Davison machine was in fact being used to practice that monopolized process. It could hardly be said that McKee, who now says that he never heard of Davison, in fact extinguished him for all purposes.

These considerations seem to exclude the possibility of patenting, under the first patent in suit, the machine which is disclosed in patent No. 988,583, for the dual purpose of excluding every machine that may function in shaving plates *with* or *without* a matrix. It is perhaps a restatement of the matter to say that, if the "process" is novel because of the introduction of the matrix step, then if the shaving step is taken *with* a machine *which exerts local pressure* on shaving *with a matrix* in the same manner and with the same local pressure which, as the identical machine, it would exert in shaving *without* a matrix, then, if the machine is not novel in the latter, it cannot be novel, *as a machine*, in the former, case.

[4] Resorting to a known machine or device for carrying out either an old or a new step in a patentably novel "process" does not make the machine or device patentably novel in the sense of the patent law. And, pursuing this thought, it is believed that every one of McKee's process claims in his basic matrix patent (No. 857,531) could be paraphrased—and should in fact be so considered in addressing the then art—by substituting, for his general directions for shaving, the directions to use the Davison, the Lane, the Holmes, or other known types of shaving machines. Therefore neither patent No. 988,583, nor 1,054,130, presents anything for consideration as *novel*, save the alleged mechanical device, a "plurality of spring-pressed fingers," etc., in the one as a *means* (mechanical) for carrying out *one step* of a novel process; in the other, as a *novel element* in a "new printing plate shaving machine."

The file history of the first patent in suit, No. 1,054,130, furnishes rather cogent support for the position taken by the defendant in this case, especially in view of the clear failure on the part of the Patent Office examiners to be advised respecting the state of the art. On the strength of references dealing with veneer-cutting machines, the principal examiner had rejected, among others, this claim:

"(1) In a machine of the character described a shaving knife and means arranged to exert pressure locally upon the plate being shaved, along the same, in close proximity to the knife." Also a second claim, adding: "Means for regulating said pressure." He observed, on comparing the McKee structure with the veneer-cutting machines, that "the definition of the pressing devices as a plurality of spring-pressed ones, as the sole distinction over these references, is not seen to patentably distinguish."

But the examiners in chief, on reversing the principal examiner, assigned as grounds: "The appealed claims are clearly allowable over the patents to which the examiner directs attention there being in these patents no means which is so arranged that it will exert pressure locally upon a *plate* or *equivalent element* being shaved and in close proximity to the knife. As pointed out by appellant [McKee] the veneer-cutting machines of the patentees have means for exerting pressure, not locally, but transversely *and entirely across the veneers* which are being cut. The pressure means of these patents would be of no utility in appellant's machine, which, as will be understood, shaves

printing plates in such a way as to *produce elevations and depressions on its back* in order to vary, when the plate is used on different parts of the printing face. It is evident that the veneer-cutting machines and printing plate shaving machines are analogous devices." (Italics supplied.)

Could the examiners have made this finding, had their attention been called to Davison? Could their distinction of the veneer roller, on the ground that it exerted pressure *"transversely and entirely across,"* stand against Davison's choice of a plurality of fingers "acting with *much greater certainty than rollers,* the certainty arising out of distribution and localization of pressure? Could it stand against Lane or Holmes & Beugler, in their "divided" pressure rollers as a clear (identical, I believe) disclosure in a planing machine of "means * * * so arranged that it will exert pressure locally upon a plate or *equivalent element* being shaved." Opinion of examiners, supra.

Again, when we find McKee, from the first, committing himself to a claim of novelty because of the matrix step, we find, also, that on this very patent the examiners in chief took him at his word, seeking allowability of his claim, not as for a machine to plane, to level, to create parallelism, to remove "shrinks" or "sinks," but, inescapably, *to produce* an uneven printing surface of predetermined area or depth, to secure light or dark effects in printing. And, whether or not his pressure device worked in that way and with the result represented, he secured his claims; and his success is bottomed solely upon the presence of his asserted basic novel step, the matrix, and upon the absence of the conclusive references now brought forward by defendant.

[5] There remains for consideration the second patent in suit, No. 1,077,621, whose object is stated to be a "treatment" of a printing plate, "so that its printing face and its back will be brought into substantial parallelism, thus obviating the necessity of using an underlay during the printing operation, the treatment of the plate also being carried out without the use of the matrix."

The patent simply states, in terms of "process," the operation and result of the machine of the first patent as a shaving machine when used on a plate without a matrix. It may be said of this, as of every machine or process which is brought to the attention of the court, that the machines and machine processes each and all seek to effectuate "parallelism." McKee's "process" under patent No. 988,583, his machine under patent No. 1,054,130, deal with and aim to effectuate parallelism in a plate plus the matrix; in patent No. 1,077,621, the parallelism is effected against the plate alone, but the law of operation of the mechanism or means in either case results in the same parallelism.

Now a machine or a device that will produce parallelism of plate faces, or of any other subject, may be novel; but parallelism as a desideratum in a plate, and as a resultant of the machine operation, is not a concept of a process in the sense of the patent law. When the machine, in view of its law, produces parallelism, then the "process" is nothing other than carrying out the mechanical law by or through the machine. If the machine used in the "process" of the second patent in suit is the machine—and it is—of the first patent in suit, then the alleged production of "parallelism" upon only a part of the subject upon which the machine of the first patent was intended to operate does not and cannot introduce what might be called another or segregated "novelty," another "novel" parallelism, and therefore the subject of "process" patenting. The "process" of the second patent is nothing other than *using the machine* of the first. Regardless of any other considerations in the case, it strikes me that the second patent in suit must be defeated on these grounds.

The conclusions in the case are:

First. That the first patent in suit is void, as anticipated by Davison, when considered as disclosing the plurality of spring-pressure devices; that such patent is void, as anticipated by Lane and Holmes and Beugler, and their type in the shaving or planing art, as embodying not only the plurality of pressure devices, but also their method and manner of attachment and control.

Second. That in no event can the first patent in suit have any validity beyond the disclosure and claim for the use of a machine to effectuate a novel process of shaving over a matrix. As hereinbefore indicated, it is my judgment that the patent, as covering a device fully anticipated, cannot have even such limited validity.

Third. That patent No. 1,077,621 is anticipated as the first patent in suit is held to be anticipated; and it is void upon the further ground that it does not disclose a "process" or a device patentably novel, separate and apart from the patentee's prior disclosures.

A decree dismissing the complaint may be entered.