## CATON PRINTING CO. v. DANIELS MFG. CO.

### No. 5114.

Circuit Court of Appeals, Seventh Circuit.

Sept. 20, 1934.

Arthur C. Brown, of Kansas City, Mo., for appellant.

Louis Quarles and Irving T. Babb, both of Milwaukee, Wis., for appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

SPARKS, Circuit Judge.

This bill charged appellee with infringing claims 4 and 5 of United States patent No. 1,693,886, issued December 4, 1928.

The patent relates to a method and machine for slip-sheeting a roll-feed or rotary printing press when printing on any type of material. A slip sheet of blotting material serves not only to help support the printed sheet in its passage through the press, but to prevent ink from the freshly printed sheet from smudging or offsetting upon another sheet when piled up at the delivery end of the press.

The original bill relied upon both types of claims, but at the trial appellant abandoned the machine claims and relied solely on process claims 4 and 5.[1] The defense was invalidity based on prior uses.

On May 13, 1933, after the bill was filed and shortly before the trial, when depositions had been taken tending to show prior use, appellant filed a disclaimer[2] limiting the

---

[1] "4. In the art of printing a strip, the method of slip-sheeting consisting of advancing a strip of slip-sheeting synchronously with the strip to be printed, cutting the strips simultaneously, and delivering the cut sheets together.

"5. In the printing art, the method of slip-sheeting comprising introducing a slip-sheet strip into the paper-carrying members of a printing press in company with the paper to be printed, cutting the strip into sheets, carrying the slip sheets through the press with the print paper, and delivering the slip sheets with the printed paper."

[2] "Disclaimer.

"1,693,886.—Herschel Caton, Kansas City, Eugene Caton, Rosedale, Kans., and Lloyd C. Howard, Kansas City, Mo. Method of Slip-Sheeting and Means for Practicing the Same. Patent dated December 4, 1928. Disclaimer filed May 13, 1933, by the assignee, Caton Printing Company.

"Hereby enters the following disclaimer in relation to said patent:

"Petitioner disclaims from the scope of the specification of the said patent, the slip-sheeting of all print sheets excepting those that are difficult to handle because of the unusual characteristics of transparency and a tendency to curl when unrestrained, and particularly print sheets exemplified by the commercial article known as 'Cellophane' and the like, the handling of which, through automatic printing presses, was, prior to the present invention, regarded as impracticable; and from the scope of each and all of the claims of said Letters Patent, any method or means of practicing the method defined in said claims, except such as employed in the printing of transparent material difficult to handle and having a tendency to curl if unrestrained."

method of the patent to slip-sheeting transparent material difficult to handle, especially cellophane.

The court found that the claims in suit, as affected by the disclaimer, were invalid and void on account of anticipation by the public knowledge, existence, sale and use of each of Meisel presses Nos. 184, 561, 801, and 774, and were invalid and void as not proper method claims. For these reasons the court dismissed the bill for want of equity, and this ruling constitutes the basis of the appeal.

In explanation of the objects of the patent it may be said that the use of slip sheets to protect the printed sheets from offsetting antedates this patent many years. In earlier years this was accomplished by hand; but upon the advent and use of roll-feed printing machines, including rotary sheet printing presses that cut sheets from the roll of print paper before printing, where it is impracticable to insert slip sheets manually because of the speed of delivery, the offset problem became more pronounced. The problem was further aggravated when the print paper used was fragile, or difficult to handle, or was transparent, thus permitting the offset marks to show through the face of the sheet. It was under these conditions, appellant claims, that the patentees made the discovery which constitutes the basis of the patent.

The objects as set forth in the application are: (1) To associate slip sheets with freshly printed sheets printed on a roll-feed press; (2) to introduce an auxiliary strip into association with print paper in a printing apparatus for supporting the print paper or for preventing offset, and to deliver auxiliary sheets synchronously with printed sheets; (3) to introduce an auxiliary web into a machine performing a plurality of operations including severance on a principal web, and provide for conducting the auxiliary web and sheets cut therefrom in association with said principal web and sheets cut therefrom and for delivering the auxiliary web sheets in company with the principal web sheets.

It is claimed by appellant that these objects were accomplished as disclosed by the patent by using certain means conceived and constructed by patentees in combination with an ordinary roll-feed printing press, which, it may be added, was manufactured and sold by Meisel Press Manufacturing Company to appellant. An elevation of that press, together with patentees' attachments, is shown in Fig. 2 of the patent application here reproduced, together with Fig. 3, which is a

detail perspective view of the slip sheet roll-supporting element of the preferred structure.

Fig. 2.

Fig. 3.

For many years Meisel had manufactured and sold presses such as this, and patentees merely added to the original Meisel press a slip-sheet roll 32 from which the slip sheet is fed over tension roller 45 and slip-sheet guide roller 48 to idler 11, where it contacts with the under side of the material to be printed as it comes from roll 7.

The press as manufactured and delivered to appellant by Meisel is represented in Fig. 2 by numbers below 30; and the attachments or means added to the press by appellee are represented in Figs. 2 and 3 by numbers above 30. As explanatory of the figures the specification says:

"Our invention consists in the introduction of a slip sheet into the means for carrying the print paper into and through the machine for delivery by the mechanism that normally delivers the printed sheets, and comprises preferably, as in the illustrated application of the invention, the provision of an auxiliary or supplemental web 31 of slip sheet paper, supporting paper, or other backing strip, supplied on a roll 32 supported on a rotatable shaft 33 by journal block members 34 and 35 fixed on extension members 36 secured to the printing press frame. The roll-supporting members may be of a conventional type and preferably include a disk 37 fixed to the shaft 33 and rotatably positioned in a journal member 38 comprising hinged re-

cessed halves clamped together for braking the rotatable shaft as desired by a set screw 39, and means for supporting the journal member 38 adjacent the block 34, and shifting the shaft, and roll carried thereby, transversely of the press to adjust the slip sheet web to the web of print paper. Said supporting and shifting means include retaining arms 40 fixed to the journal member halves projecting across the edges of the journal recess, to retain the disk, and a threaded gauge pin 41 extending through the journal element 34 rotatably, restrained from longitudinal movement therethrough by means generally indicated by a block 42, the inner end of the pin being threadedly engaged in an opening 43 of the journal block 34.

"Paired brackets 44 are pivoted downwardly on the extension members 36 adjacent the ends thereof and a tension roller 45 is rotatably carried in the ends of the brackets in bearing members 46 adjustable lengthwise of the brackets by spring elements 47 for spacing the roller from the extension support, and the web of the slip sheet passes over this roller. A slip sheet guide roller 48 is rotatably supported on a bracket 49 by the frame of the press in alignment with the guide rollers and idlers of the web to be printed. The continuous web of the slip sheet element may be carried over the tension roller and the guide roller and brought into relation with the web to be printed, assembled therewith over the idler 11 and fed into the feed rollers 12 for carriage through the printing press coincidentally with the web to be printed."

Infringement of the claims in suit is admitted by appellee; but it contends that the court found that a method similar to that of this patent of using slip sheets in printing on such materials employed by patentees was, many years before the invention date, pointed out and practiced, notably in the use of presses built by Meisel Press Manufacturing Company, and was used by others in connection with presses built by Meisel for more than two years prior to the date of the invention.

The court found that in 1911 Meisel manufactured a roll-feed printing press, serial number 184, on the order of Eastman Kodak Co. It was for use in printing sensitized paper, and was equipped with a triple roll bracket, and was adapted for use with one or two rolls of sensitized paper and a slip sheet. It was put into commercial use by Eastman in 1911, and continuously and publicly, since that time, it has been so used in printing sensitized paper with a slip sheet.

When two rolls of sensitized material were run through this press at the same time, the sensitized sides faced each other and a slip sheet of black paper was run between them to keep the light from the sensitized paper and to prevent movement of the sensitized sides against each other. The printing was done upon the opposite sides of the cards, and, of course, there was no protection against smutting or offsetting except as to the sensitized sides, because the printed sides, as they were cut and laid down, came into contact with each other without any sheet between them. The advantage of this method, however, was in overcoming the tendency of the material to curl on the sensitized side through facing these sides together with the slip sheet between them, which not only protected the sensitized sides, but in a measure stiffened the sheets as they were together put through the press. The evidence discloses that the tendency of sensitized paper to curl is much more pronounced than that of cellophane. This press, however, was operated by Eastman to print either one or two post card rolls at a time, depending on the volume of work at hand. If but one roll of post cards was to be printed there were but two rolls used, that is to say, one of sensitized paper and one of slip sheet. In that event the slip sheet acted not only to protect the sensitized sheet from the light and from scratching, but also to prevent ink from the printed side from smutting the sensitized side.

It is contended, however, by appellant that this press was changed after it was received from Meisel, and that it was not used as manufactured. The evidence does not support this contention. Minor changes were made for the sake of convenience, but in no material manner did they affect the method or process, and they were not necessary in order to perform the function of the patent.

The court found that during the years 1917 to 1919, Meisel manufactured for Eastman a web or roll-feed press, serial number 561, for use in printing sensitized paper. It was equipped with a double mill roll bracket and was adapted for use with one roll of sensitized paper and a slip sheet. It was tested at the Meisel plant and on February 15, 1919, shipped to Eastman, who immediately put it into commercial use; and from that time until the time of taking depositions in that cause, in February and March, 1933, it was continuously and publicly used in printing sensitized paper with a slip sheet.

The court further found that in May, 1923, the Conley Foil Company ordered from Meisel a double mill roll web or roll-feed press for printing foil with a slip sheet, and upon that order, press No. 801 was manufactured by Meisel, tested at its plant, and shipped to Conley in November, 1923. It was designed for printing metal foil of a fragile nature, and was adapted for use with one roll of foil and a separate roll of slip sheet or supporting material. Conley immediately put it into commercial use, and since that time it has been so used in printing foil with the aid of a separate slip sheet roll.

The court further found that in August, 1922, Lehmaier-Schwartz & Co., Inc., ordered from Meisel the same kind of press, and designed for the same use as the one delivered to Conley. It was made under serial number 774, tested at the Meisel plant, and shipped to the purchaser in November, 1924, by whom it was immediately put into commercial use; and since that time it has been so used in printing foil with the aid of a separate slip sheet roll.

It was further found by the court that the construction of the four presses last mentioned, and the method of printing and slip-sheeting thereon, were identical with the patent in suit, and we are convinced that the evidence fully supports the finding beyond a reasonable doubt.

■■ It seems clear that patentees' accomplishment amounted to nothing more than an analogous or double use. A mere substitution of one material to be printed upon for another of prior use, without involving any essential change in structure or different mode of construction, or without involving different problems from those of the prior use, is not invention, but constitutes analogous use. Howe Machine Co. v. National Needle Co., 134 U. S. 388, 10 S. Ct. 570, 33 L. Ed. 963; Concrete Appliances Co. v. Gomery, 269 U. S. 177, 46 S. Ct. 42, 70 L. Ed. 222; Concrete Mixing & Conveying Co. v. R. C. Storrie & Co., 282 U. S. 175, 51 S. Ct. 95, 75 L. Ed. 278. The application of an old process and machine to a similar or analogous subject will not ordinarily sustain a patent even if the new subject matter has not before been contemplated, for that would merely be a double use. Pennsylvania Railroad Co. v. Locomotive Engine Safety Truck Co., 110 U. S. 490, 4 S. Ct. 220, 28 L. Ed. 222; Lovell Mfg. Co. v. Cary, 147 U. S. 623, 13 S. Ct. 472, 37 L. Ed. 307; Potts v. Creager, 155 U. S. 597, 15 S. Ct. 194, 39 L. Ed. 275. That there was no invention in

patentees' machine claims is admitted by the disclaimer; and the use of cellophane, which is first mentioned in the disclaimer, involves no different problem from those which had been solved by the machines of the prior use. The use of slip sheets to prevent offsetting was older than either of the machines or processes here discussed. The machines of the prior use successfully handled materials having a greater tendency to curl and more fragile than cellophane. The characteristic of transparency, which is stressed for the first time in the disclaimer, adds nothing to the claims, for it merely accentuates the necessity of preventing offsetting; and the materials used in the presses of the prior use were just as difficult to handle as cellophane. Other materials, including transparent materials to be used for wrapping, had long before been printed without running a smut-sheet through the press. Cellophane was then a comparatively new product and its use for such purposes was not so general. It soon came into extended use, and when it was desired to print upon it, difficulty was encountered, largely because of its tendency to curl, which it seems was overcome by using the roll of slip sheet. It seems to us that the prior practices disclosed methods whereby those difficulties might be avoided in the use of cellophane, and the mere application of those methods to cellophane would not involve invention. Indeed, the evidence discloses that cellophane was used with a slip sheet in one of the prior use presses as successfully as it was used in patentees' device and process, and the identical results were there produced without in any way modifying the device.

Appellant contends that evidence on which the finding is based is not credible. A perusal of the record does not sustain this contention, and the finding of the court in this respect is fully supported by the following decisions of this circuit: Parlin & Orendorff Co. v. Moline Plow Co. (C. C. A.) 89 F. 329; Moline Plow Co. v. Rock Island Plow Co. (C. C. A.) 212 F. 727; Guy v. Stein (C. C. A.) 239 F. 729; Hobbs Patent Co. v. Atlas Specialty Mfg. Co. (C. C. A.) 244 F. 176; James Clark, Jr., Electric Co. v. U. S. Electrical Tool Co. (C. C. A.) 245 F. 753; Cottrell & Sons Co. v. Claybourn Process Corp. (D. C.) 17 F.(2d) 279.

■ Appellant further relies upon the commercial success of the patent, but this can only be relied upon where doubts exist as to the validity, and we think they are not present here. Commercial success can never be used to create a doubt and then to resolve it.

Findings of the trial court in a patent case are not binding on the appellate court, but they will not be disturbed where the trial court heard the testimony of the witnesses and there is any credible evidence to sustain the findings. Adamson v. Gilliland, 242 U. S. 350, 37 S. Ct. 169, 61 L. Ed. 256; Howard v. Howe (C. C. A.) 61 F.(2d) 577; Uihlein v. General Electric Co. (C. C. A.) 47 F.(2d) 997; Blettner v. Gill (C. C. A.) 251 F. 81. It is true that not all the testimony was taken in open court, but that which was taken by deposition was of such character as to leave no doubt in our minds as to the correctness of the trial court's decision.

Appellee also attacks the validity and effectiveness of the disclaimer. It is not necessary to decide this question, for, even if the disclaimer be valid as such, we think the patent is invalid for lack of novelty, and that the cause was properly dismissed for want of equity.

Decree affirmed.